No. 97-212

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 177

STATE OF MONTANA,

Plaintiff and Respondent,

v.

SCOTT DALE MILLER,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Michael F. Bailey, Doreen D. Antenor, Bailey & Antenor, Missoula, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana; Robert L. "Dusty" Deschamps, Missoula, Montana

Submitted on Briefs: December 18, 1997

Decided: July 16, 1998

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

**¶1 Scott Dale Miller (Appellant) appeals from a jury verdict, judgment, and sentence of the Fourth Judicial District Court, Missoula County, convicting him of mitigated deliberate homicide. We affirm.**

**¶2 We restate the issues as follows:**

**¶3 1. Did the District Court err in denying Appellant's motions for dismissal and entry of judgment as a matter of law on the basis of insufficient evidence?**

**¶4 2. Was Appellant denied a fair trial as a result of alleged improper comments made by the prosecutor during his closing argument?**

**¶5 3. Did the District Court err in requiring Appellant to register as a violent offender without issuing findings concerning Appellant's violent offender status, and**

No

without providing Appellant a hearing to present contradictory evidence regarding his status?

## BACKGROUND

¶6 This case arose out of the death of James Mitchell (Mitchell). During the morning hours of September 16, 1995, Mitchell, his wife Wendy, Brent Bovee (Bovee), and Pamela Songer (Songer) began drinking alcohol. At about noon, having consumed a fifth of liquor, Mitchell and Bovee decided to go to Appellant's home to borrow money for more alcohol. The Mitchells, Bovee, Songer, and Appellant all lived in the same trailer court. Appellant and the Mitchells had known each other for five years. At Appellant's home, Appellant, Mitchell, and Bovee drank beer for about an hour, and then Wendy and Songer arrived. Mitchell and Bovee then left to buy more alcohol. Appellant stayed behind and continued drinking. When Mitchell and Bovee returned an hour later, they appeared more intoxicated than when they had left. Appellant, the Mitchells, Bovee, and Songer resumed drinking together.

¶7 Later that afternoon, Appellant and Mitchell left in Appellant's car. Soon thereafter, the two women left, but Bovee remained at Appellant's home sleeping on the couch. Appellant and Mitchell returned at about 5:00 p.m. and Wendy returned 15 minutes later. Appellant sat in a chair and Mitchell sat on the couch. Bovee was passed out on the couch. Appellant then cleaned his pipe and began smoking marijuana. Mitchell leaned over, touched Appellant on the arm and asked Appellant for the pipe. Appellant responded, "Don't touch me." Mitchell pressed Appellant again for the pipe and asked him what was the matter. Appellant again told Mitchell to quit touching him. Appellant "went ballistic" and an argument erupted between the two. Appellant ordered Mitchell to get out of his house. Mitchell refused to leave. Appellant went to his bedroom and Mitchell followed apparently wanting to know why Appellant was so upset. Wendy remained in the living room.

¶8 While in the bedroom, Appellant obtained a pistol. Wendy heard scuffling in the hallway. Appellant and Mitchell ended up in the bathroom where the only means of entry and exit was the bathroom door. Wendy did not know who entered the bathroom first, but evidence suggested that Mitchell forced open the bathroom door. Wendy then went to the bathroom to convince Mitchell to leave. Several times Wendy heard Appellant order Mitchell to "get out of here." She heard Appellant exclaim, "If you don't get out of here, I'm going to shoot you," and "I'm going to fire

a warning shot." Wendy testified that Appellant did not say these words in a way that would suggest he was begging Mitchell to leave him alone. Wendy then heard the warning shot. Evidence showed that Appellant fired the warning shot from the back wall of the bathroom, where the bathtub was located, toward the door. Again, Wendy heard Appellant tell Mitchell to leave or he would shoot Mitchell in the foot. Wendy heard the gun fire again. Appellant had shot Mitchell in the mouth at close range, killing him instantly.

¶9 After the shot was fired, Appellant left the bathroom and told Wendy to telephone 9-1-1. Appellant went next door where his mother, Rose Miller (Rose), lived. Rose testified that Appellant was upset and that he stated to her, "I couldn't let him keep hurting me . . . why did he make me do this?" He also stated that he didn't know where exactly Mitchell was shot. Rose telephoned 9-1-1 and reported the incident. Appellant spoke with the 9-1-1 operator and mentioned being beaten. Officers soon arrived at Rose's house and took Appellant into custody. The officers administered a blood test on Appellant and the state forensic pathologist administered a blood test on Mitchell's body. Appellant's blood sample indicated a blood alcohol content (BAC) of .20 and presence of the drug tetrahydrocannabinol (THC). Mitchell's blood sample indicated a BAC of .25.

¶10 A trial by jury was held October 29-31, 1996. Wendy testified that Mitchell and Appellant experienced physical disabilities. Mitchell once had a broken neck, he had undergone three separate surgeries for herniated discs in his back, and he was about to have reconstructive surgery on his knee. Appellant had "a problem with his shoulder." Appellant was a sawyer by trade. Wendy testified that Mitchell was not working and was collecting social security disability benefits. She further testified that both Mitchell and Appellant drank heavily and smoked marijuana occasionally. Wendy testified that Mitchell and Appellant had argued several times in the years they had known each other, but that only one of these arguments resulted in a physical altercation. She further testified that in the months preceding the date of Mitchell's death, the friendship between Mitchell and Appellant had changed. She stated that Appellant was angry at Mitchell for "hanging out" with his ex-wife. Wendy admitted that she once had an extramarital affair with Appellant. On the day of the shooting, Appellant told Wendy he was having a bad day and everything was going wrong. Appellant mentioned that his saw was broken and that he had a problem with his ex-wife.

¶11 Rose testified that although her son and Mitchell got along well, she thought Mitchell was argumentative and combative, and she did not welcome Mitchell in her home. Rose stated that Mitchell's reputation among residents of the trailer court was "not good" and that most residents would have nothing to do with him.

¶12 Songer testified that Mitchell had fought with her boyfriend and brother-in-law. She testified that Appellant's usual disposition when drunk was that he got mouthy and wanted to "roll around in the dirt." Songer stated that in a prior argument at Appellant's home, Appellant and Mitchell were engaged in pushing and shoving but Mitchell left upon Appellant's request. Songer further testified that during the afternoon on the date of Mitchell's death, Appellant and Mitchell appeared to be getting along well.

¶13 Nadine Jensen (Jensen), a resident of the same trailer court and an employee at a local bar often frequented by Appellant and Mitchell, testified that she had known Appellant and Mitchell for 8 or 9 years. She stated that on several occasions she heard the two men arguing outside her home at night. Jensen recounted one day, long before the incident at issue, when Appellant was drunk, approached her on her porch, mentioned the Mitchells, and briefly stated he should just shoot Mitchell. However, Jensen stated that Appellant's demeanor at the time he made the statement was such that she thought he was joking. Jensen testified that the Mitchells often picked fights at the bar and that they were no longer welcome there. She testified that she never had any problems with Appellant while at the bar.

¶14 Sheriff's Deputy Patrick Turner (Turner), one of the first officers to respond to the 9-1-1 call, transported Appellant to the police station. Turner testified that Appellant was cooperative, that Appellant communicated effectively, that he understood every word Appellant was saying, and that Appellant followed instructions completely. In booking Appellant, Turner took his measurements and reported that Appellant was six feet two inches tall and weighed 190 pounds.

¶15 Lynn Kurtz (Kurtz), a forensic scientist with the state crime lab, opined that Appellant's BAC of .20 impaired Appellant's judgment and reasoning functions, and created an unsafe condition for handling a firearm.

¶16 Doctor Gary Dale (Dr. Dale), a pathologist with the state forensic science division, performed the autopsy. Dr. Dale testified that Appellant's gun was in direct

contact with Mitchell's skin when it discharged. The barrel of the gun was pointed at an angle of 55 degrees so that the primary direction of the bullet was upwards relative to the position of Mitchell's body. Dr. Dale stated that the gunshot wound was in an unusual location for a homicide. Appellant's attorney asked the following question of Dr. Dale:

> Given the number of homicide victims that you have autopsied and the angle to the path of the bullet, is it not conceivable that the deceased, in driving himself into the upper body of the Defendant and the Defendant raising his hands to protect himself from blows, with the gun in one of those hands, that the deceased drove his face into the gun at the time of the discharge of the firearm?

Dr. Dale responded:

> Based on the angle? Again, the best way to answer that is just using the -- that angle. If you can create a scenario where the firearm discharges at that angle, it's possible.

Dr. Dale measured Mitchell's body and testified that Mitchell was six feet four and one half inches tall and weighed 202 pounds.

¶17 Sheriff's Detective Scott McDonald (McDonald) was assigned to investigate the crime scene. McDonald testified that he found broken glass in the living room but that it was possible the broken glass may have predated the shooting. He testified that the bathroom door was broken at the hinges but that Wendy told him she "had been in the house before and knew the door was kind of that way." McDonald testified that Mitchell's blood and cap were found in the bathtub. McDonald also testified that firing the type of gun used by Appellant required only slight pressure, two and one half to three pounds. McDonald testified that during his interview with Appellant, Appellant stated he had been injured and complained of a sore shoulder from being pushed into a wall by Mitchell. Photographs of Appellant's shoulders were entered into evidence. McDonald acknowledged that Appellant's right shoulder was disproportionate in size from his left, but stated he did not know whether this condition stemmed from a pre-existing injury. Wendy had earlier testified that Appellant suffered from a disability, "a problem with his shoulder."

¶18 Appellant neither testified nor presented any witnesses to testify on his behalf. However, based on his attorney's opening statement, closing argument, and cross-examination of the State's witnesses, it was apparent that Appellant was asserting justifiable use of force as an affirmative defense. Appellant claimed he was trapped in the bathroom with no means of escape, that he fired a warning shot, that Mitchell lunged at him, and that in order to protect himself from serious bodily harm, he raised his hands at which point Mitchell drove his face into the barrel of the gun and it discharged.

¶19 At the conclusion of the State's case, Appellant moved the court for dismissal of the charge on grounds that the State had not proven its case. That motion was denied. Appellant then informed the court that he would call no witnesses to testify on his behalf and rested his case. The jury returned a verdict finding Appellant guilty of mitigated deliberate homicide after which Appellant moved the court for judgment as a matter of law. The motion was denied. Appellant appealed to this Court. Additional facts will be provided as necessary to dispose of the issues raised.

## DISCUSSION

### Issue 1

¶20 Did the District Court err in denying Appellant's motions for dismissal and entry of judgment as a matter of law on the basis of insufficient evidence?

¶21 It is within the sound discretion of the District Court whether to dismiss an action at the close of the State's case for insufficient evidence. Section 46-16-403, MCA. We will not disturb the District Court's ruling unless Appellant shows an abuse of discretion. State v. Miller (1988), 231 Mont. 497, 509, 757 P.2d 1275, 1282. We have held that a motion to dismiss for insufficient evidence "should be granted *only* where there is *no evidence* upon which a trier of fact could base a verdict." Miller, 231 Mont. at 509, 757 P.2d at 1282 (citations omitted)(emphasis in original). This Court reviews the sufficiency of the evidence to determine whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Miller, 231 Mont. at 509, 757 P.2d at 1283.

¶22 Appellant was charged and convicted of mitigated deliberate homicide pursuant

**to § 45-5-103(1), MCA. That statute provides:**

> A person commits the offense of mitigated deliberate homicide when the person purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional distress for which there is reasonable explanation or excuse. The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor's situation.

"Purposely" is the most culpable mental state and implies an objective or design to engage in certain conduct, although not particularly toward some result. Sections 45-2-101(63) and -201(2), MCA; Compiler's Comments to § 45-5-102, MCA, p.163. "Knowingly" refers to a state of mind in which a person acts, while not toward a certain objective, at least with full knowledge of relevant facts and circumstances. Sections 45-2-101(34) and -201(2), MCA; Compiler's Comments to § 45-5-102, MCA, p.163. A finding of "extreme emotional or mental distress for which there is reasonable explanation or excuse" will not lie where the only mitigating circumstances asserted are the defendant's anger and intoxication. State v. Williams (1993), 262 Mont. 530, 541, 866 P.2d 1099, 1106 (citation omitted).

**¶23 Justifiable use of force, or self-defense, is a complete affirmative defense to mitigated deliberate homicide. Section 45-3-115, MCA. Although the State retains the burden of proving the underlying offense beyond a reasonable doubt, the defendant who raises justifiable use of force as an affirmative defense assumes the "burden of producing sufficient evidence on the issues to raise a reasonable doubt of his guilt . . . ." State v. Daniels (1984), 210 Mont. 1, 16, 682 P.2d 173, 180-81. To establish justifiable use of force, Montana law requires that a defendant show that: (1) he was not the aggressor; (2) he reasonably believed he was in imminent danger of unlawful harm; and (3) he used reasonable force necessary to defend himself. Sections 45-3-102 and -105, MCA; State v. Demers (1988), 234 Mont. 273, 280, 762 P.2d 860, 865.**

**¶24 Appellant does not contest that he purposely or knowingly caused the death of Mitchell. However, Appellant contends that he acted in self-defense. Appellant argues that he was not the aggressor; that he reasonably believed he was in imminent danger of unlawful harm; that he used reasonable force necessary to defend himself; and that given the facts and circumstances surrounding the shooting, no rational**

trier of fact could have concluded otherwise. The State counters that while Appellant presents one version of the events, the evidence and testimony presented at trial clearly support another version of the events, that Appellant committed mitigated deliberate homicide. We agree with the State.

¶25 In State v. Bower (1992), 254 Mont. 1, 8, 833 P.2d 1106, 1111, we stated:

> The fact that the defendant's testimony conflicted with that of the State's witnesses does not, by itself, render the evidence insufficient to support his conviction. The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact; when the evidence conflicts, the trier of fact determines which shall prevail.

It is the jury's prerogative to accept or reject a defendant's claim of self-defense. State v. Crazy Boy (1988), 232 Mont. 398, 401, 757 P.2d 341, 343. Here, the jury weighed the evidence, assessed the credibility of witnesses, and found that the State's version of the incident was more credible than Appellant's. Such a finding is supported by the evidence.

¶26 The State produced sufficient evidence from which a jury could find that Appellant shot Mitchell under extreme mental or emotional stress. Appellant's usual disposition when drunk was that he became mouthy and wanted to "roll around in the dirt," yet on the day of the shooting, when Mitchell touched Appellant's arm, Appellant "went ballistic" and ordered Mitchell out of the house. Appellant's and Mitchell's arguments were usually resolved nonviolently, yet on the day of the shooting, Appellant got a pistol from his bedroom. After the shooting, Appellant told his mother, "I couldn't let him keep hurting me . . . why did he make me do this?"

¶27 The State also produced sufficient evidence from which a jury could find reasonable explanation or excuse for Appellant's extreme mental or emotional stress. Wendy testified that the friendship between Appellant and Mitchell had recently become strained due in part to her admitted love affair with Appellant and the fact that Mitchell was spending time with Appellant's ex-wife. On the date of Mitchell's death, Appellant told Wendy he was having a bad day because of problems with his ex-wife and his broken saw. Mitchell's usual disposition when drunk was that he was argumentative and combative. In a prior argument at Appellant's home that involved pushing and shoving, Mitchell left Appellant's home upon request. However, on the day of the shooting, Mitchell refused to leave upon Appellant's

request and instead followed him into the bedroom and bathroom. Evidence showed that Appellant's level of intoxication impaired his judgment and reasoning. Given these circumstances, the jury was justified in finding Appellant guilty of mitigated deliberate homicide because there existed other mitigating circumstances besides Appellant's intoxication and fear of being assaulted.

¶28 We next consider Appellant's contention that he produced sufficient evidence from which a jury could find that he acted in self-defense. Whether a defendant meets the requirements necessary to support his theory of self-defense is a question of fact for the jury. State v. Crabb (1988), 232 Mont. 170, 174, 756 P.2d 1120, 1123. We have held that the degree of force a person uses to defend himself must be commensurate with the threat of harm the person faces. *See* State v. Stone (1994), 266 Mont. 345, 347, 880 P.2d 1296, 1298. A person is justified in the use of deadly force "only if he reasonably believes that such force is necessary to prevent imminent death or imminent bodily harm to himself or another or to prevent the commission of a forcible felony." Section 45-3-102, MCA. Deadly force is "force likely to cause death or serious bodily harm," and includes the firing of a firearm in the direction of a person, even though no purpose exists to kill or inflict serious bodily harm. Section 45-3-101(1), MCA. A "felony" is an offense punishable by either death or imprisonment exceeding one year, and a "forcible felony" is a felony involving the use or threat of physical force or violence against any individual. Section 45-2-101 (22) and (23), MCA. A person's belief of imminent death or imminent serious bodily harm may be reasonable even if it is mistaken. State v. Bashor (1980), 188 Mont. 397, 425, 614 P.2d 470, 485-86.

¶29 The record shows that Mitchell weighed only twelve pounds more and measured only two and one half inches taller than Appellant. Mitchell was unarmed and suffered several physical disabilities. When Appellant told Mitchell to leave or he would shoot, Appellant did not say these words in a way that would suggest, as Appellant claims, that he was begging Mitchell to leave him alone. Although Appellant claimed the loose hinges on the bathroom door showed that Mitchell forced it open in pursuit of Appellant, Wendy told Officer McDonald that the "door was kind of that way." Although Mitchell had an argumentative and combative disposition, Appellant and Mitchell usually resolved their arguments nonviolently. Upon these facts, any rational trier of fact could have found that Mitchell would not or could not have carried out a threat to kill or seriously injure Appellant, and that Appellant's belief of imminent death or serious bodily harm, or his belief that a

forcible felony was about to be committed, was unreasonable. The absence of a reasonable belief as to imminent death or serious bodily harm renders Appellant's use of deadly force unreasonable. Section 45-3-102, MCA.

¶30 We hold there existed sufficient evidence from which a jury could find that Appellant shot Mitchell under extreme mental or emotional distress for which there is reasonable explanation or excuse, and that Appellant was not justified in the use of deadly force against Mitchell. We determine the District Court did not abuse its discretion in denying Appellant's motions to dismiss and for judgment as a matter of law on the basis of insufficient evidence.

*Issue 2*

¶31 Was Appellant denied a fair trial as a result of alleged improper comments made by the prosecutor during his closing argument?

¶32 During his rebuttal closing argument, the prosecutor made the following statement to the jury:

> Like [Dr.] Gary Dale said, there's any number of possible ways you could arrange these bodies and have things come out the way they did. One thing we do know, there's no blood on the Defendant. This guy is looming over the top of him, how come the Defendant wasn't covered with blood?

Appellant objected to this statement claiming that "this was not introduced at trial" and "there's evidence to the other effect," but did not request the court to admonish the jury or give the jury a cautionary instruction. The court overruled the objection.

¶33 Appellant alleges prosecutorial misconduct in that the prosecutor not only improperly commented on facts not in evidence, but mischaracterized those facts. As support for his allegation, Appellant points to defendant's Exhibit D, a forensic science division examination report describing evidence that had undergone testing by the forensic serologist. Exhibit D indicated that the serologist found blood stains on Appellant's blue jeans, but that the results obtained for genetic typing of these blood stains were inconclusive. Appellant chose not to offer Exhibit D into evidence. On appeal, Appellant attached Exhibit D to his brief as proof that the prosecutor improperly commented on facts not in evidence. Without citation to authority,

Appellant argues that the prosecutor's statement was highly prejudicial and amounted to a denial of his right to a fair trial.

¶34 Appellant's claim of prosecutorial misconduct is not reviewable. Appellant's action in placing before this Court a document that was not admitted into evidence and which is not part of the record violates Rule 9, M.R.App.P. It is well-established that this Court will not consider any evidence not contained in the record on appeal. Johnson v. Killingsworth (1995), 271 Mont. 1, 3, 894 P.2d 272, 273. The prosecutor's statement to the effect that "[we know] there's no blood on the defendant" may have been an exaggerated inference based on the state of the record before the District Court. However, based on the record before us, it is impossible to conclude that the prosecutor's statement was an outright misrepresentation of fact. We cannot consider Appellant's argument relating to prosecutorial misconduct.

¶35 In addition to the above claim of prosecutorial misconduct, Appellant alleges the State engaged in several other acts of prosecutorial misconduct including misstatements of fact and law; impermissible appeals to law, order, and community safety; and inflammatory remarks designed to appeal to the jury's emotions. Appellant did not make timely objections to these alleged errors. Appellant concedes that § 46-20-104(2), MCA, precludes this Court from reviewing an alleged error unless the complaining party made a timely objection at trial or meets one of the exceptions outlined in Montana's plain error statute, § 46-20-701(2), MCA. State v. Swoboda (1996), 276 Mont. 479, 483-84, 918 P.2d 296, 299. Appellant also concedes that § 46-20-701(2), MCA, is inapplicable as he does not meet any of the exceptions set forth therein. However, Appellant urges this Court to invoke its discretionary power of common law plain error review claiming that the alleged prosecutorial misconduct denied him his fundamental right to due process.

¶36 We clarified the common law plain error doctrine in State v. Finley (1996), 276 Mont. 126, 915 P.2d 208. We held:

> [T]his Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made and notwithstanding the inapplicability of the § 46-20-701(2), MCA, criteria, where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental farness of the trial or proceedings, or may

compromise the integrity of the judicial process.

Finley, 276 Mont. at 137, 915 P.2d at 215. In determining the applicability of the common law plain error doctrine, we consider the totality of circumstances of each case. Finley, 276 Mont. at 134, 138, 915 P.2d at 213. However, we note that the common law plain error rule is reserved for "exceptional cases" and is to be used sparingly. State v. Sullivan (1996), 280 Mont. 25, 31, 927 P.2d 1033, 1036. *See also* State v. Arlington (1994), 265 Mont. 127, 152, 875 P.2d 307, 322.

**¶37 Having reviewed the facts and circumstances of the instant case, we determine that it does not present the exceptional case envisioned to invoke the common law plain error doctrine. Many of the alleged misstatements of fact and law were either taken out of context of the prosecutor's argument, or later cured by the jury instructions. The appeals to law, order, and community safety, and alleged inflammatory references to Appellant, although overbroad and dramatic, did not render the trial unfair. *See* State v. Long (1986), 223 Mont. 502, 512, 726 P.2d 1364, 1371. We conclude that none of the alleged errors, standing alone, or taken together, resulted in a manifest miscarriage of justice, left unsettled the question of the fundamental fairness of the trial or proceedings, or compromised the integrity of the judicial process. Accordingly, we decline to address the constitutional issues relating to prosecutorial misconduct.**

*Issue 3*

**¶38** Did the District Court err in requiring Appellant to register as a violent offender without issuing findings concerning Appellant's violent offender status, and without providing Appellant a hearing to present contradictory evidence regarding his status?

**¶39 The District Court sentenced Appellant to commitment to the Department of Corrections (Department) for a term of forty years with twenty years suspended. The court determined that the treatment and security needs of Appellant could be met through the pre-release and intensive supervision programs of the Department rather than confinement. As part of Appellant's sentencing, the court ordered Appellant to register as a violent offender with the Department of Institutions, Chief of Police, and Sheriff in the county where Appellant resides, pursuant to §§ 46-23-504, -505, and-506, MCA.**

¶40 Without citation to authority, Appellant claims that the court's order requiring him to register as a violent offender infringed his fundamental right to due process. Appellant bases the alleged due process violation on the court's failure to make specific findings regarding his violent offender status, and the court's failure to hold a hearing to allow Appellant an opportunity to present contradictory evidence regarding his status. Appellant further challenges the sufficiency of the evidence to support his designation as a violent offender, noting that the court relied on the Department's presentence investigation report which indicated the following: (1) Mitchell was the primary aggressor; (2) at the time Mitchell was shot, Mitchell was in the process of assaulting Appellant; (3) Mitchell did not heed a warning shot fired by Appellant before his assault of Appellant; (4) Appellant had no prior criminal history; and (6) pre-release and intensive supervised probation adequately addressed the security needs of Appellant. Appellant argues that the these facts support a finding that he was not a violent offender.

¶41 It appears Appellant has misconstrued the court's role in designating a defendant as a violent offender. Violent offender status is determined purely by statute. Section 46-23-504, MCA, provides:

> (1) A sexual or violent offender:
>
> (a) shall register immediately after conclusion of the sentencing hearing if the offender is not sentenced to confinement or is not sentenced to the department and placed in confinement by the department.

A "violent offender" is defined as a person who has been convicted of a violent offense. Section 46-23-502(7), MCA. Mitigated deliberate homicide is a violent offense. Section 46-23-502(9), MCA. On its face, the violent offender registration statute clearly does not vest a district court with the discretion to designate defendants as violent offenders. The statute does not prescribe a notice and hearing procedure for determining violent offender status, nor does it require a district court to issue findings based on evidence regarding a defendant's violent offender status. Rather, a defendant's designation as a violent offender is triggered merely by conviction of a violent offense. Appellant's challenge as to the sufficiency of the evidence is irrelevant. Because Appellant was convicted of a violent offense, by definition he is a violent offender and, therefore, must register as such. We conclude that the District Court did not err in requiring Appellant to register as a violent offender without issuing findings concerning Appellant's violent offender status, and

without providing Appellant a hearing to present contradictory evidence regarding his status.

**¶42 Appellant raises the issue of a due process violation, but fails to cite specific authority for his argument as required by Rule 23(a)(4), M.R.App.P. We dispose of this issue by noting the following:**

> Montana recognizes that due process applies to sentencing, but the defendant's liberty interest during sentencing is less than that interest during trial. The process that is due, therefore, is not as great as that required by the substantive criminal charges. The defendant is entitled to reasonable notice and an opportunity to be heard during sentencing. Notice of the sentencing hearing itself provides sufficient notice of potential dangerous offender designation because the statute requires the sentencing court to consider the issue. As a practical matter, the criminal defendant is always on notice.

State v. Krantz (1990), 241 Mont. 501, 512, 788 P.2d 298, 305 (citations omitted). Although Krantz concerned the process due for dangerous offender designation under § 46-18-404, MCA, a statute which has since been repealed, the analysis and holding of Krantz is no less applicable. Applying Krantz to the instant case, the process due Appellant for designating him a violent offender was reasonable notice and an opportunity to be heard during sentencing. Notice of the sentencing hearing provided Appellant with reasonable notice of his violent offender status, and Appellant was given an opportunity to be heard at his sentencing. We conclude that Appellant was afforded due process at his sentencing.

**¶43 Affirmed.**

/S/ WILLIAM E. HUNT, SR.

 We Concur:

/S/ JIM REGNIER

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

No

/S/ W. WILLIAM LEAPHART