No. 02-607

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 107

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

ERWIN F. STRUBLE,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and for the County of Powell, Cause No. DC 01-15
The Honorable, Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Wade J. Dahood, Michelle Sievers, Knight Dahood McLean & Everett,
Anaconda, Montana

        For Respondent:

            Honorable Mike McGrath, Montana Attorney General, Tammy K Plubell,
Assistant Attorney General, Helena, Montana; Christopher G. Miller, Powell
County Attorney, Deer Lodge, Montana

Submitted on Briefs:  June 12, 2003

Decided:  April 27, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Erwin F. Struble (Struble) appeals the judgment of the Third Judicial District Court, Powell County, denying his motion for a directed verdict and his motion in limine and granting the State of Montana's (the State) motion in limine.

¶2      We address the following issues on appeal and affirm.

¶3      1.      Did the District Court abuse its discretion in denying Struble's motion for a directed verdict?

¶4      2.      Did the District Court abuse its discretion in denying Struble's motion in limine             regarding admission of three types of logbooks used by the Montana State      Prison?

¶5      3.      Did the District Court abuse its discretion in granting the State's motion in limine regarding introduction of a letter?

### FACTUAL AND PROCEDURAL BACKGROUND

¶6      Struble worked at the Montana State Prison (MSP) for 27 years, from 1974 to 2001. Struble was promoted throughout his years of service, and he ultimately obtained the position of third shift captain in 1994.

¶7      The MSP operates on a hierarchy system, whereby the Warden is responsible for the operation of the prison. Two deputy wardens serve under the Warden, one of whom is Tom Wood (Wood). Three shift captains serve under Wood, while two lieutenants serve under each shift captain. Struble, as third shift captain, served under Wood.

¶8      Each shift captain works a different shift. As the third shift captain, Struble worked from 9:00 p.m. to 7:00 a.m., although due to an overlap in the shift captains' schedules, Struble could arrive anytime between 8:00 p.m. to 10:00 p.m. Struble worked four ten-hour shifts, having Friday, Saturday, and Sunday off each week.

2

¶9    Struble worked in the command post, which the Warden of MSP considered the "hub" of the prison. While at the command post, Struble supervised the correctional officers on duty; built schedules; reviewed leave requests; conducted security inspections of the prison; and disciplined the officers under his command.

¶10    As a command post captain, Struble was required to serve as a duty officer once every two months, whereby he was on-call twenty four hours a day. He earned a guaranteed one hour of overtime Monday through Friday and two hours of overtime on Saturday and Sunday. He earned additional overtime for the time it took for him to handle a situation while on-call. Also, as a shift captain, Struble was required to attend four training sessions per year and to attend regularly-scheduled shift commander and unit manager meetings, which usually occurred once a month. Struble also was occasionally required to serve on committees and to participate in personnel matters.

¶11    Accrual of overtime was a concern at the MSP, and, in an attempt to reduce overtime, the MSP instituted a policy known as "flexing." When "flexing" one's hours, for example, an employee who worked two additional hours on Monday would work two fewer hours on Tuesday so as not to accumulate overtime.

¶12    In January 2001, upon reviewing Struble's time sheet, Wood noticed that Struble had claimed two and one-half hours of overtime during a pay period. Wood did not believe this was correct, so he checked the command post logbook. The logbook indicated that Struble had worked an eight-hour shift on a particular day, thereby making it difficult for him to accumulate overtime. Wood also reviewed the checkpoint and lobby logbooks, which also

3

indicated that Struble had worked less than forty hours that week and, thus, should not have accumulated overtime.

¶13    The MSP maintains several logbooks to ensure the safety of both the MSP employees and the inmates.  The logbooks pertinent to Struble consisted of:  (1) the checkpoint logbook; (2) the lobby logbook; and (3) the command post logbook.  The checkpoint at the MSP controls the traffic into and out of the prison.  It is manned twenty-four hours per day by a correctional officer.  This officer must check in and check out each person who enters and exits the prison and the respective times each person enters and exits.  Should the officer forget to log-in a person, the officer notes that the entry into the checkpoint logbook is a "late entry."  Several memoranda issued by Wood reiterated the need for the checkpoint officers to strictly adhere to the policy of checking in and checking out all individuals who enter and exit the prison.

¶14    The lobby at the MSP is another mechanism used by the prison to screen the individuals coming into and out of the prison.  The lobby is open from 6:00 a.m. until 10:00 p.m.  The officers who work in the lobby check in and check out all administrative staff, vendors, visitors, and volunteers who enter the prison. Frequently, Struble was logged in by these officers but not logged out due to the hours that the lobby was open.

¶15    The command post is the "hub" of the MSP and is manned by shift captains and lieutenants.  Only shift captains and their lieutenants make entries into the command post logbook.  The purpose of the command post logbook is to record who is on duty and what occurs while that person is on duty.  As third shift captain, Struble was required to log in and

4

to log out of the command post by recording both his name and the time he was on and off duty. This requirement was recorded in a memorandum written by Woods to all shift captains, stating that: "Each shift commander is responsible to log himself into the command-post logbook when reporting for duty and, again, when leaving shift for the day. The time and date will be included preceding the entry as standard procedure."

¶16    After noticing the discrepancies in Struble's time sheet, Woods checked Struble's time sheets for the previous six months and, again, checked them against the logbooks. In so doing, Woods discovered a total of forty-eight hours for which Struble received payment that could not be accounted for by Struble's logbook entries or by training session or meeting minutes. Thereafter, Woods turned over his findings to Vickie Murphy (Murphy), a certified public accountant for the Department of Corrections (DOC), for additional investigation.

¶17    Murphy began reviewing Struble's time sheets, leave slips, the logbooks, training records, compliance monitoring records, security audit records, personnel records, and meeting minutes. She entered the information she gathered into a spreadsheet, wherein she calculated the differences between the times Struble logged in and the times Struble logged out (as recorded in the command post logbook) in relation to the times that Struble claimed he had worked on his time sheets. If Struble had failed to log out, the spreadsheet indicated such an occurrence as an uncalculated number. Murphy also reviewed the checkpoint logbooks. Upon her review, she discovered instances where the hours that Struble indicated he had worked did not match the hours as reflected in the logbooks. She termed these instances as "exceptions."

5

¶18    In reviewing the exceptions in her spreadsheet, Murphy considered only those exceptions that indicated a fifteen minute or greater difference. She consulted compliance monitoring records, security audit records, training and personnel records and meeting minutes, shift commander meeting minutes, and committee meeting minutes in an attempt to account for the exceptions that indicated a fifteen minute or greater time difference. Ultimately, Murphy discovered sixty three exceptions for which the time differences could not be accounted. She submitted this information to an investigator with the Department of Justice, and further investigation ensued. The State ultimately charged Struble with felony theft, felony tampering with public records, and misdemeanor official misconduct.

¶19    Struble testified at trial that the logbook records upon which Murphy's spreadsheet was based were inaccurate, especially given that he sometimes failed to log in or to log out, he never entered a "late entry" into the logbooks, and he routinely flexed his time. Specifically, he testified that Murphy failed to account for the meetings for which no minutes existed or on which the minutes did not reflect he was in attendance.

¶20    A jury trial found Struble guilty of the felony theft and misdemeanor official misconduct charges. The District Court dismissed the felony tampering with public records charge before Struble's case was submitted to the Jury. Struble was sentenced to three years deferred on the felony theft charge and six months deferred on the misdemeanor official misconduct charge.

¶21 Struble now appeals the District Court's denial of his motion for a directed verdict and his motion in limine regarding introduction of a letter. He also appeals the District Court's granting of the State's motion in limine regarding introduction of the logbooks as evidence under the business records exception.

## STANDARD OF REVIEW

¶22 We review a district court's denial of a motion for a directed verdict to determine whether, in denying that motion, the district court abused its discretion. *State v. Miller*, 1998 MT 177, ¶ 21, 290 Mont. 97, ¶ 21, 966 P.2d 721, ¶ 21. We review a district court's rulings on evidentiary matters, such as motions in limine, for an abuse of discretion. *State v. Delaney*, 1999 MT 317, ¶ 6, 297 Mont. 263, ¶ 6, 991 P.2d 461, ¶ 6.

## DISCUSSION

¶23 **1.    Did the District Court abuse its discretion in denying Struble's motion for a directed verdict?**

¶24 Struble argues that no evidence existed to show that he "was not entitled to the payroll and benefits he received," nor was there direct evidence linking him to the alleged offenses. Struble maintains that no witnesses testified that he "was not working or engaged in employment related functions at the times he reported on his time cards," Further, the logbooks on which the State heavily relied, Struble argues, were "inaccurate, untrustworthy and unreliable," as they "were not designed to keep time records of MSP's employees."

¶25 The State counters that it "presented overwhelming evidence of Struble's guilt," through testimony of MSP accepted time sheet and logging practices. As such, the District Court did not abuse its discretion in denying Struble's motion for a directed verdict.

7

¶26 Under § 46-16-403, MCA, if the prosecution's evidence is insufficient to support a finding or verdict of guilty at the close of the prosecution's evidence or at the close of all the evidence, then a district court may dismiss the action against the defendant upon a motion from the court or the defendant. However, a defendant is entitled to a directed verdict only "if reasonable men could not conclude from the evidence taken in a light most favorable to the prosecution that guilt has been proved beyond a reasonable doubt." *State v. Hocevar*, 2000 MT 157, ¶ 118, 300 Mont. 167, ¶ 118, 7 P.3d 329, ¶ 118. Thus, "when circumstantial evidence is susceptible to differing interpretations, it is within the providence of the jury to decide which will prevail." *State v. Brady*, 2000 MT 282, ¶ 28, 302 Mont. 174, ¶ 28, 13 P.3d 941, ¶ 28.

¶27 Upon Struble's motion for a directed verdict at the close of the State's evidence, the District Court ruled that it could not "concur" that in considering the evidence "in a light most favorable to the prosecution could it be said that the Jury could not find in favor of the State and convict the Defendant." Hence, the District Court denied Struble's motion for a directed verdict on that basis.

¶28 Here, the Jury had before them considerable evidence concerning Struble's time sheets, MSP's policy regarding logbook entries, and Struble's duties as a shift captain. This evidence included the "exceptions" Murphy discovered and Struble's explanation of those "exceptions." Hence, the Jury had before them evidence that was susceptible to differing interpretations--i.e., the Jury could choose to believe that Struble received payment for hours which he did not work, given the evidence of the hours that he reported against the times the

8

logbooks reflected that he was working; or the Jury could choose to believe Struble's explanation that the seeming "unaccounted" hours were due to the fact that logbooks were inaccurate and did not reflect hours for which he was in training, on-call, or in civilian clothes. On this evidence, the standard for granting a directed verdict was not satisfied.

¶29 Therefore, we hold that the District Court did not abuse its discretion in denying Struble's motion for a directed verdict, as the evidence does not meet the criteria necessary under § 46-16-403, MCA, for a directed verdict.

¶30 **2. Did the District Court abuse its discretion in denying Struble's motion in limine regarding admission of three types of logbooks used by the Montana State Prison?**

¶31 Struble argues that the logbooks should not have been admitted under the business records exception of the Montana Rules of Evidence, as the logbooks lack trustworthiness and are inadmissible on that basis. Specifically, Struble contends that because the MSP employees did not accurately maintain the logbooks, nor was there a systematic check in place to ensure the accuracy of the logbooks, the logbook business records cannot be presumed reliable. *Bean v. Montana Board of Labor Appeals*, 1998 MT 222, ¶ 20, 290 Mont. 496, ¶ 20, 965 P.2d 256, ¶ 20.

¶32 The State argues that Struble's contentions regarding the logbooks go to the weight afforded to them as evidence, rather than their admissibility. Specifically, the State argues that it was "undisputed that the logbooks were an intrinsic part of running the prison." As such, the State "presented the logbooks for what they were--regularly recorded business

9

records and did not attempt to mislead the jury" with the notion that the logbooks kept time records of employees.

¶33   Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), M.R.Evid.  Hearsay evidence is not admissible unless an exception applies. Rule 802, M.R.Evid.  One such exception is the business records exception, which states:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time of the acts, events, conditions, opinions, or diagnosis, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  Rule 803(6), M.R.Evid.

¶34   We addressed the business records exception in *Bean*, wherein we held that the Incident Report upon which the defendant's wrongful termination claim rested was inadmissible as a business record. *Bean*, ¶ 27.  We held that the Incident Report lacked trustworthiness because:  (1) it was not prepared as part of the employer's routine business activity, and, rather, was prepared as part of the employer's activity of disciplining its employees; and (2) the information contained in the Incident Report was provided by a third party who was not an employee, and, thus, had no duty to report accurately to her employer. *Bean*, ¶¶ 23, 24.

¶35   We also addressed the business records exception in *State v. Edmundson* (1990), 246 Mont. 241, 805 P.2d 1289, wherein we held that the records at issue were trustworthy and admissible because they "were made in the regular course of business of the [group home],"

10

by an individual who had a duty to record any reported behavioral problems while the incidents were fresh in this individual's mind. *Edmundson*, 246 Mont. at 244, 805 P.2d at 1292.

¶36    Here, as a shift captain for MSP, Struble was required to log himself in at the command post when he arrived on shift and to log himself out at the command post when he left. This requirement of MSP was documented in several memoranda from Struble's supervisor. Because the command post was considered the "hub" of the MSP, documentation of who was on shift and what occurred during that shift was essential to the continued safety of the MSP employees and inmates. These safety concerns also prompted the logging in and logging out procedures applicable at both the MSP lobby and checkpoint stations. And, although not perfect, the policy of entering a "late entry" was instituted for instances when employees forgot to log in or log out either themselves or others.

¶37    Unlike the Incident Report utilized in *Bean*, and similar to the report prepared in *Edmundson*, the MSP logbook records were prepared as part of MSP's routine activity. Activity at the MSP consists of operating a prison where inmates serve their respective sentences. These operations also incorporate prison safety for both the employees and the inmates. The logbooks are an essential part of these operations and, being kept in the regular course of MSP's business, are trustworthy.

¶38    In addition, these logbook records are trustworthy given that they are prepared by MSP employees as part of their routine duties. Unlike the Incident Report used in *Bean*, the

11

MSP logbook records are prepared by MSP employees whose duties are to report accurately the variety of people who enter and exit the prison.

¶39 Therefore, we hold that the logbook records were admissible under the business records exception, and the District Court did not abuse its discretion in denying Struble's motion in limine regarding admission of these records.

¶40 **3. Did the District Court abuse its discretion in granting the State's motion in limine regarding introduction of a letter?**

¶41 Struble argues that the State lacked sufficient evidence to prosecute him. In support of his argument, Struble asserts that in a letter, which he intended to introduce, the county attorney admitted "that it lacked evidence" which would establish that six other MSP employees "were not working or performing employment related functions at the times reported on their pay claim sheets." Hence, Struble argues that because the State used the same logbooks in its investigation of him as it did for the other six MSP employees, the State, in essence, admitted that it lacked evidence to prosecute him as well. Further, Struble argues that this letter was admissible under Rule 803(6) of the Montana Rules of Evidence, as the State "prepared the letter as part of its regularly conducted business activities," and the letter was trustworthy because "it was authored by the person against whom it was being offered." In addition, Struble argues that the State's admission in the letter was admissible as an admission by a party opponent under Rule 801(d)(2) of the Montana Rules of Evidence.

¶42 The State argues that assuming the letter was admissible under the business records exception, which it was not, it was not relevant to the matters at issue in Struble's case.

12

Specifically, the State argues that "[a]t issue in Struble's case was whether Struble received compensation, based upon representations he made on his timesheets, for hours that he did not work." As such, the States asserts that the District Court "correctly concluded that since the evidence against Struble was not exactly the same as the evidence, or lack of evidence, against other prison employees . . . [the] evidence was not relevant to the matter at issue in Struble's case." We agree.

¶43    Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid.

¶44    Here, the issue before the District Court was whether Struble received payment from MSP for hours which he did not work. In attempting to prove that Struble did in fact receive these payments, the State introduced considerable time sheet and logbook evidence through testimony of several MSP employees. The letter that Struble attempted to introduce did not concern whether Struble received payment for hours which he did not work. Rather, this letter, written by the county attorney to the DOC, targeted the county attorney's concern that he did not have sufficient evidence to prosecute six other MSP employees on charges similar to Struble's--i.e., theft and official misconduct. Hence, this letter was not evidence tending to make any fact of consequence--whether Struble received payment for hours which he did not work--more probable or less probable. Simply, the letter did not concern Struble and was irrelevant to the State's prosecution of him. Therefore, we hold that the District Court

13

did not abuse its discretion in granting the State's motion in limine regarding Struble's attempt to introduce the letter.

¶45    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE