No. 00-708

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 120

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

JACOB GARY SPANG,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Carl White, Attorney at Law, Havre, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; Tammy K. Plubell, Assistant
Attorney General, Helena, Montana,

            David G. Rice, Hill County Attorney, Havre, Montana

Submitted on Briefs:  November 8, 2001

Decided:  June 7, 2002

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Jacob Gary Spang ("Spang") appeals from his convictions, by a jury, of two counts of intimidation by accountability in the Montana Twelfth Judicial District Court, Hill County. We affirm in part, reverse in part and remand for a new trial on the two counts of intimidation by accountability.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the District Court err in denying Spang's motion to suppress the statements he made to law enforcement officers during a custodial interrogation conducted on September 19, 1999?

¶4 2. Did the District Court err in denying Spang's motion to dismiss the charges of intimidation by accountability based on insufficiency of the evidence?

BACKGROUND

¶5 On September 16, 1999, the bodies of Kristi Walker ("Walker") and Kevin Caplette ("Caplette") were discovered at Walker's residence in Havre, Montana. Both victims died as a result of gunshot wounds inflicted by Reid Danell ("Danell"). On the evening of September 17, 1999, Danell and Spang were arrested in Great Falls, Montana, in connection with the murders of Walker and Caplette. Danell subsequently admitted to shooting the victims.

¶6 On September 17, 1999, Assistant Chief of Police of the Havre Police Department, Kevin Olson ("Officer Olson"), traveled to the Cascade County Regional Detention Facility to interview Spang. After Spang was advised of his rights by Officer Olson, Spang voluntarily answered questions during a custodial interrogation on

2

September 17, 1999. The custodial interrogation was videotaped. The audio portion of the videotape is difficult to hear.

¶7 On September 19, 1999, Officer Olson and Staff Sergeant George Tate of the Havre Police Department conducted another custodial interrogation of Spang. After being advised of his rights, Spang stated, "Shit, I need a lawyer, man." After Spang requested an attorney, Officer Olson asked Spang whether he wanted to talk to the police prior to talking with an attorney. In addition, Officer Olson stated that he would like to talk to Spang about what they had discussed on September 17, 1999. Spang answered that was "[a]lright" and proceeded to answer Officer Olson's questions while therein providing similar incriminating statements as he provided on September 17, 1999.

¶8 During both interrogations, Spang explained what had occurred at Walker's residence on the night of September 15, 1999, and the morning of September 16, 1999. Spang stated that he and Danell attended a party at Walker's residence on September 15, 1999. Spang indicated that many of the party goers, including himself and Danell, were smoking methamphetamine and drinking alcohol. He further explained that Walker sold drugs and owed a debt to Wesley Merrill ("Merrill") resulting from her sale of drugs. Spang stated that Danell and Merrill were members of the LVL 13 gang and that he was awaiting induction as a member into said gang. According to Spang, Danell volunteered to collect from Walker the money she owed Merrill or collect items from Walker's residence as collateral to satisfy the debt. Spang conveyed that Danell did in fact demand

3

money from Walker, and in doing so, threatened to inflict physical harm upon her if she did not pay the debt. Spang stated that Walker thereafter left her residence, and that during that time he assisted Danell in collecting collateral from Walker's garage. Spang also told how he unloaded and reloaded a clip to a nine millimeter rifle during that time period. Spang disclosed that he later observed Danell threaten and then subsequently shoot Caplette. Spang explained that shortly after observing Danell shoot Caplette, he observed Danell shoot Walker. Afterwards, Spang stated that he accompanied Danell to Great Falls.

¶9 On October 14, 1999, the State filed an Information in the District Court charging Spang with two counts of deliberate homicide by application of the felony murder rule, two counts of felony intimidation by accountability, felony theft, and tampering with physical evidence. Attorneys Carl White ("White") and Edmund Sheehy ("Sheehy") were appointed to represent Spang.

¶10 On March 15, 2000, Spang filed a motion to suppress the statements he made on September 17 and September 19, 1999, claiming his statements were made in violation of his constitutional right to counsel and his right to be brought before the nearest judge without unnecessary delay. The District Court held an evidentiary hearing on March 23, 2000. On April 11, 2000, the District Court entered its Order denying Spang's motion to suppress. The District Court determined that Spang waived his right to counsel after being advised of his rights when he voluntarily answered questions on September 17, 1999, and again voluntarily answered questions, after

4

requesting an attorney, on September 19, 1999.  Additionally, the District Court determined that the 2 ½ day delay between Spang's arrest on a Friday night and arraignment on the following Monday morning was not excessive, unreasonable nor prejudicial.  The District Court noted that the customary practice in Great Falls is to conduct an initial appearance on Monday morning when individuals are arrested between Friday afternoon and Monday morning.  Further, the District Court determined that Spang presented no evidence to suggest that the delay influenced the voluntariness of his statements made to officers during the period of delay.

¶11  On May 23, 2000, Spang filed a motion to dismiss alleging his right to a speedy trial had been violated.  On May 31, 2000, the District Court held a pretrial conference and informed the parties that it could not conduct a hearing on Spang's motion prior to the June 5, 2000, trial date.  Sheehy informed the District Court, at the pretrial conference, that it was in Spang's best interest to withdraw the motion.  White disagreed.  The District Court gave Sheehy and White additional time to discuss the matter.  Later that day, White withdrew the motion.

¶12  A jury trial was held June 5 through June 13, 2000.  Both parties prepared transcripts from the tapes of Spang's September 19, 1999, custodial interrogation.  The transcripts were provided to the jury as the videotape and audio tapes from the September 19th custodial interrogation were played during the State's case-in-chief.  The transcripts made from the custodial interrogation were not sent into the jury room during deliberations.

¶13  At the conclusion of the State's case-in-chief, Spang moved to dismiss the charges of intimidation by accountability and deliberate homicide by application of the felony murder rule based on insufficiency of the evidence, pursuant to § 46-16-403, MCA. The District Court denied Spang's motion finding that there was sufficient evidence to sustain convictions on the charges.

¶14  On June 13, 2000, the jury returned its verdicts of not guilty to both charges of deliberate homicide and the charge of theft, and guilty to both charges of intimidation by accountability and the charge of tampering with physical evidence. On August 7, 2000, the District Court entered its Judgment sentencing Spang to ten years on each conviction of  intimidation by accountability, and one year and one day on the tampering with physical evidence conviction. The District Court ordered that all three sentences be served concurrently at the Montana State Prison. Spang appeals from his convictions of two counts of intimidation by accountability.

STANDARD OF REVIEW

¶15  We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Simmons*, 2000 MT 329, ¶ 9, 303 Mont. 60, ¶ 9, 15 P.3d 408, ¶ 9 (citation omitted).

¶16  We review a district court's denial of a motion to dismiss based on insufficiency of the evidence for an abuse of discretion. *State v. Miller*, 1998 MT 177, ¶ 21, 290 Mont. 97, ¶ 21, 966 P.2d

6

721, ¶ 21 (citation omitted).  In reviewing the sufficiency of the evidence, we determine whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Miller*, ¶ 21 (citation omitted).

DISCUSSION

ISSUE 1

¶17 Did the District Court err in denying Spang's motion to suppress the statements he made to law enforcement officers during a custodial interrogation conducted on September 19, 1999?

¶18  Spang argues he unequivocally invoked his right to counsel, after he was read his *Miranda* rights, when he stated, "Shit, I need a lawyer, man."  After requesting counsel, Spang argues that he should not have been further questioned until either counsel was made available to him or until he initiated further communications with the officers.  Since counsel was not made available to Spang nor did he initiate further communications with the officers, Spang alleges all interrogation should have ceased, including Officer Olson's questioning regarding whether he wanted to talk to the officers prior to talking with an attorney.  In addition, Spang argues that the District Court's reliance, in part, on our holding in *State v. Brubaker* (1979), 184 Mont. 294, 602 P.2d 974, was misplaced, as the defendant in that case reinitiated conversation with officers after he stated that it would be advisable for him to speak to a lawyer.  Therefore, Spang argues since the District Court erred in admitting the statements he made on September 19th,

7

his convictions of two counts of intimidation by accountability should be reversed and this matter should be remanded for a new trial.

¶19 The State claims Spang's request for counsel was equivocal or ambiguous. The State contends that when an equivocal request is made for counsel, the better practice is to allow law enforcement officers to ask limited questions to clarify whether a suspect is invoking his or her right to counsel, pursuant to the United States Supreme Court's holding in *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362. The State therefore maintains that the officers properly asked Spang clarifying questions to determine whether Spang wished to contact counsel before continuing with the interview. Thereafter, the State alleges that Spang voluntarily elected to continue with the interview, and thus waived his right to counsel.

¶20 The United States Supreme Court has held that a suspect is entitled to the assistance of counsel during a custodial interrogation and that law enforcement officers must explain this right to a suspect prior to questioning. *Miranda v. Arizona* (1966), 384 U.S. 436, 469-473, 86 S.Ct. 1602, 1625-1627, 16 L.Ed.2d 694. The right to counsel established in *Miranda* is a procedural safeguard to insure that the right against compulsory self-incrimination, provided by the Fifth Amendment to the United States Constitution, is protected. *Michigan v. Tucker* (1974), 417 U.S. 433, 443-444, 94 S.Ct. 2357, 2363-2364, 41 L.Ed.2d 182. If suspects effectively waive their right to counsel after receiving

8

*Miranda* warnings, law enforcement officers are free to question the suspects. *North Carolina v. Butler* (1979), 441 U.S. 369, 372-376, 99 S.Ct. 1755, 1756-1759, 60 L.Ed.2d 286.

¶21 However, if suspects request counsel at any time during the interview, they are not subject to further questioning until a lawyer has been made available or until the suspect reinitiates conversation with law enforcement officers. *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378. If a suspect makes a reference to an attorney that is ambiguous or equivocal, the cessation of questioning is not required. *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 (citing *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885). Hence, questioning may continue if a suspect does not actually request to speak to an attorney. *See Davis*, 512 U.S. at 462, 114 S.Ct. at 2357 (The *Davis* Court determined that the statement, "[m]aybe I should talk to a lawyer", is not an actual request for counsel.) The Court in *Davis* noted that when a suspect makes an ambiguous or equivocal statement, it will often be "good police practice" for interviewing officers to clarify whether or not the suspect wants an attorney. *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356. Nonetheless, the *Davis* Court declined to adopt a rule requiring officers to ask clarifying questions in such situations. *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356.

¶22 We have held that the right to counsel afforded by Article II, Section 24, of the Montana Constitution is broader than the rights afforded by the United States Constitution. *See State v. Johnson*

9

(1986), 221 Mont. 503, 514-515, 719 P.2d 1248, 1255. As we have previously noted, "[f]ederal rights are considered minimal and a state constitution may be more demanding than the equivalent federal constitutional provision." *Johnson*, 221 Mont. at 513, 719 P.2d at 1254 (citation omitted). Therefore, "[w]e will not be bound by decisions of the United States Supreme Court where independent state grounds exist for developing heightened and expanded rights under our constitution." *Johnson*, 221 Mont. at 513, 719 P.2d at 1255 (quoting *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 433, 712 P.2d 1309, 1313). Moreover, "a state court always is responsible for the law of its state before deciding whether the state falls short of a national standard, so that no federal issue is properly reached when the state's law protects the claimed right." *Johnson*, 221 Mont. at 514, 719 P.2d at 1255 (quoting Hans A. Linde, *E Pluribus -- Constitutional Theory and State Courts*, 18 Ga.L.Rev. 165, 178 (1984)). Accordingly, even where we accept the State's analysis insofar as it pertains to the United States Constitution, we refuse to "march lock-step" with the United States Supreme Court when the provisions of the Montana Constitution call for greater protection of an individual's rights than that guaranteed by the United States Constitution. *Johnson*, 221 Mont. at 512, 719 P.2d at 1254.

¶23 Therefore, relying on our own Constitution and applicable law, we held in *Johnson* that the defendant invoked his right to counsel when he inquired whether he had the right to address "somebody," immediately after he was read his *Miranda* rights, and subsequently

10

stated, "I would like to talk to somebody." *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. Since the right to counsel "is not and should not be a right easily abridged" under our Constitution, we thus concluded in *Johnson* that the implication of asking to speak to "someone," after the reading of an individual's rights, refers to a request for counsel. *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. We pointed out in *Johnson* that "[l]ay people are not learned in constitutional principle nor legal nicety." *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. Thus, "[t]o require precise words be uttered would elevate form over substance." *Johnson*, 221 Mont. at 514, 719 P.2d at 1255.

¶24 We further held in *Johnson* that the defendant's subsequent conversation with law enforcement officers did not result in the voluntary waiver of his right to counsel. *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. Although the defendant in *Johnson* initiated the portion of the conversation wherein he provided incriminating statements, we determined that the defendant's statements were all part of one taped interview, lasting only seven minutes, initiated by the law enforcement officers subsequent to Johnson's request for counsel. *Johnson*, 221 Mont. at 514, 719 P.2d at 1255. Consequently, we concluded that the defendant's incriminating statements should not have been admitted during the State's case-in-chief. *Johnson*, 221 Mont. at 515, 719 P.2d at 1255.

¶25 While the State argues that Spang's request for counsel was ambiguous or equivocal, we recall few requests which exceed the clarity and lack ambiguity as illustrated by Spang's request for

11

counsel. Here, Spang specifically requested "a lawyer" after he was *Mirandized*, unlike the defendant in *Johnson* who merely requested to speak to "somebody." Accordingly, we conclude that Spang's request for counsel is neither ambiguous nor equivocal. Therefore, we hold once Spang unequivocally requested counsel, he was not subject to further questioning by law enforcement officers until an attorney was made available to him or until he initiated further conversation with the officers. Since counsel was not made available to Spang nor did he initiate the portion of the conversation wherein he provided incriminating statements to law enforcement officers on September 19th, we further hold that Spang did not waive his right to counsel when he answered the officers' questions. *See Johnson*, 221 Mont. at 514-515, 719 P.2d at 1255.

¶26    In addition, we conclude that the District Court's reliance, in part, on our holding in *Brubaker* is misplaced. We held that the defendant in *Brubaker* waived his right to counsel when he told law enforcement officers that "it would probably be advisable for me to obtain an attorney", and immediately thereafter stated that he did not need an attorney at that time. *Brubaker*, 184 Mont. at 300-301, 602 P.2d at 977-978. Subsequently, the defendant in that case voluntarily provided a statement to the officers. *Brubaker*, 184 Mont. at 300, 602 P.2d at 977. Moreover, Brubaker was not questioned by law enforcement officers during a custodial interrogation, as he was questioned at his place of employment and was not under arrest at the time of his questioning. *Brubaker*, 184 Mont. at 299, 602 P.2d at 977. Conversely in the case at hand,

12

Spang was questioned at the Cascade County Regional Detention Facility subsequent to his arrest. Further, Spang unequivocally invoked his right to counsel and remained silent until he was further questioned by Officer Olson unlike Brubaker. Thus, in contrast to *Brubaker*, cessation of questioning was required in this case until Spang either reinitiated conversation with the officers or until Spang was provided an attorney. As neither event occurred, we hold that the District Court erred when it denied Spang's motion to suppress the statements he made during the custodial interrogation on September 19th. As a result, we must now determine whether such error was harmless.

¶27 We will not reverse a case by reason of any error committed by the District Court against the convicted person unless the record shows that the error was prejudicial. *See* Section 46-20-701(1), MCA. We recently adopted a two-step analysis in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, to determine whether the error at issue in a case prejudiced the criminal defendant's right to a fair trial and is therefore reversible pursuant to § 46-20-701(1), MCA. The first step in the analysis is to determine whether the error is categorized as "structural" error or "trial" error. *Van Kirk*, ¶ 37.

¶28 Structural error "[a]ffects the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Van Kirk*, ¶ 38 (citations omitted). This type of error is "typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding." *Van Kirk*,

13

¶ 38.  Errors in the jury selection process, total deprivation of the right to counsel, and lack of an impartial trial judge are examples of structural error.  *Van Kirk*, ¶ 39 (citations omitted).  Structural error is automatically reversible and is not subject to harmless error review under § 46-20-701, MCA.  *Van Kirk*, ¶¶ 38-39.

¶29  In contrast, trial error typically occurs during the presentation of a case to the jury.  *Van Kirk*, ¶ 40.  "Such error is amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other evidence introduced at trial."  *Van Kirk*, ¶ 40.  Trial error is not presumptively prejudicial and is subject to review under § 46-20-701(1), MCA.  *Van Kirk*, ¶ 40.

¶30  We conclude that the error in this case is trial error since the error occurred during the presentation of the case to the jury and is amenable to qualitative assessment for prejudicial impact relative to the other evidence introduced at trial.  We thus proceed to the second step of the analysis, which involves determining whether the error was harmless under the circumstances.  *Van Kirk*, ¶ 41.  To do so, we conduct a "cumulative evidence" test to ascertain whether the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence proved.  *Van Kirk*, ¶ 43.

¶31  The State must direct us to admissible evidence that proved the same facts as the tainted facts in making its proof under the "cumulative evidence" test.  *Van Kirk*, ¶ 44.  In addition, the State must also demonstrate that the quality of the tainted

14

evidence was such that there was "no reasonable possibility" that it might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44. If the only evidence tending to prove an element of the crime is tainted, then reversal will be compelled. *Van Kirk*, ¶ 45. However, where the tainted evidence does not go to the proof of an element of the crime charged, and there is no other admissible evidence tending to prove the particular fact at issue, the admission of the tainted evidence will be deemed harmless if the State demonstrates that, qualitatively, no reasonable possibility exists that the admission of the tainted evidence might have contributed to the defendant's conviction. *Van Kirk*, ¶ 46.

¶32 This case presents an analogous scenario as that which we presented, by way of example only, in *Van Kirk*. In our example in *Van Kirk*, we expressed that if the tainted evidence in a case involves the admission of an involuntary confession made by a defendant, the State will be "hard-pressed to demonstrate that, qualitatively, there is no reasonable possibility that this evidence might have contributed to the defendant's conviction, even though there was other evidence tending to prove that the defendant committed the crime." *Van Kirk*, ¶ 44. Such a difficult task faced by the State in our example is now a reality encountered by the State in the case at hand.

¶33 Here, the State claims that the evidence presented to the jury by the statements Spang made on September 19th was repetitive of what was properly presented to the jury by the statements Spang made on September 17th and testimony from witnesses during the

15

trial, including the testimony of Danell, Francine Spang, Donny Ferguson, and Amanda Grant. After reviewing the record, we agree. Nevertheless, Spang points out that transcripts were prepared, by both parties, from the tapes of the September 19th custodial interrogation and given to the jury to read as those tapes were played during the State's case-in-chief. However, the videotape from the September 17th custodial interrogation was not transcribed, as the audio quality of the videotape was too poor to transcribe. In response, the State fails to demonstrate that, qualitatively, there is no reasonable possibility that the September 19th statements and transcripts made therefrom did not contribute to Spang's conviction.

¶34 Moreover, our review of the record reveals that the State specifically relied upon the statements Spang made on September 19th in its closing argument. For example, the prosecutor stated during his closing argument:

He [Spang] says he took a stereo amplifier and a drill from the bedroom, it's not a
drill but a saw that looked like a drill, and **this is what transpires on the 19th**
**between Olson and the defendant.**

Kevin Olson says, okay, wait a minute, when does he go back and get the rifle?
The defendant says, he already had it when we went back in here, the bedroom.
And Kevin Olson said, he threw it in the closet while you guys put the amp and
drill in here?  And what did the defendant say?  Yeah.

. . . .

And during the course of his **taped interview with Olson on the 19th**,
what did the defendant say Danell did most of the first day, the day of the

16

16th in Great Falls?  That he slept. [Spang] [s]till hangs around.  Why would he hang
around?  Well, if you want to get into a gang, if you want to be worthy,
if you want to be a stand-up guy, are you going to abandon your partner
when he's on the lamb?  No, of course not.
The defendant's actions, after the murders, are consistent with somebody
who wanted to help Reid Danell get away with two counts of murder.
[Emphasis added.]

¶35  Although there was other sufficient evidence tending to prove that Spang committed two counts of intimidation by accountability, we conclude that, qualitatively, there exists a reasonable possibility the statements Spang made during the custodial interrogation on September 19th contributed to his convictions because of the strong emphasis placed on those statements during the trial.  Consequently, we hold that the District Court committed reversible error when it admitted Spang's September 19th statements during the State's case-in-chief.  Therefore, we remand this case for a new trial on the two counts of intimidation by accountability and instruct the District Court that the statements Spang made on September 19th shall not be admitted during the State's case-in-chief.

¶36  We note that Spang additionally alleges his September 19th statements should have been suppressed because the 2 ½ day delay between his arrest on the evening of Friday, September 17, 1999, and his initial appearance on the morning of Monday, September 20, 1999, was unnecessary, and thus violated § 46-7-101(1), MCA.  Since we have held that the District Court erred in admitting Spang's September 19th statements for the foregoing reasons, we will not

17

address whether the September 19th statements should have been suppressed on additional grounds.

¶37  To the extent that Spang also challenges the admission of his September 17th statements on unnecessary delay grounds, we hold that the District Court did not err in admitting such statements at trial.  In cases involving statements made during the interim between arrest and initial appearance, the requirement of a prompt initial appearance is considered in the context of the voluntariness of the statements.  *State v. Plouffe* (1982), 198 Mont. 379, 387, 646 P.2d 533, 537 (citations omitted).  Here, in light of Spang's concession on appeal that he voluntarily made statements to Officer Olson on September 17th, after waiving his right to counsel, there is no evidence to suggest that the delay between Spang's arrest and initial appearance influenced the voluntariness of those statements made on September 17th.  Accordingly, we affirm the District Court's denial of Spang's motion to suppress his September 17th statements.

ISSUE 2

¶38  Did the District Court err in denying Spang's motion to dismiss the charges of intimidation by accountability based on insufficiency of the evidence?

¶39  Spang contends the keystone to proving intimidation is communication of a threat.  Spang alleges, however, that no evidence was presented at trial that he solicited, aided, abetted, agreed, or attempted to aid  Danell in communicating to Caplette or Walker a threat to inflict personal harm on either of them.  Spang

18

argues, at most, the evidence showed that he may have assisted Danell in gathering collateral from Walker's garage, but this occurred outside the presence of Caplette or Walker. Thus, since Caplette and Walker were unaware that Spang assisted Danell in collecting collateral, Spang argues there was no evidence presented that he aided or solicited Danell in communicating threats to the victims. Additionally, Spang claims that although he was present and observed Danell threaten to harm and subsequently kill Caplette and Walker, his mere presence at the crime scene, and even his failure to interfere with Danell's intimidation of the victims, are insufficient grounds to hold him accountable for intimidation, pursuant to our holding in *State v. Hart* (1981), 191 Mont. 375, 625 P.2d 21, *cert. denied*, 454 U.S. 827 (1981). Spang therefore contends his convictions of two counts of intimidation by accountability should be reversed and those charges should be dismissed with prejudice.

¶40 The State maintains that the District Court properly denied Spang's motion to dismiss the charges of intimidation by accountability after viewing the evidence in the light most favorable to the prosecution. The State asserts it proved the essential elements of intimidation by accountability since the evidence proffered at trial established that Spang was not merely present at the murder scene. Rather, the State alleges the evidence it presented at trial established that Spang took actions prior to and during Danell's commission of intimidating Caplette and Walker which aided and assisted Danell in the commission of the

19

crimes. For instance, Spang collected collateral from Walker's garage, tore the telephone cords out of the walls in Walker's house, and unloaded and reloaded the clip to the nine millimeter rifle later used by Danell to threaten and ultimately murder the victims. Also, the State argues the circumstances surrounding the commission of the crimes, including Spang's association with Danell prior to the crimes, his presence at the murder scene, his failure to call law enforcement during or after the commission of the crimes, his disposal of evidence, and his flight from the murder scene to another city with Danell, indicate that Spang aided and abetted Danell in the commission of intimidating Caplette and Walker.

¶41 The elements necessary to establish the offense of intimidation are stated in § 45-5-203(1), MCA (1999), which provides:

     (1) A person commits the offense of intimidation when, with the purpose
     to cause another to perform or to omit the performance of any act, he
     communicates to another, under circumstances which reasonably tend
     to produce a fear that it will be carried out, a threat to perform without
     lawful authority any of the following acts:

     (a) inflict physical harm on the person threatened or any other person;

     (b) subject any person to physical confinement or restraint; or

     (c) commit any felony.

¶42 Section 45-2-302(3), MCA (1999), provides that a person is legally accountable for the conduct of another when:

either before or during the commission of an offense with the purpose to
promote or facilitate such commission, he solicits, aids, abets, agrees, or
attempts to aid such other person in the planning or commission of the
offense.

¶43 Hence, mere presence at the scene of a crime is not enough to establish accountability, but the "accused need not take an active part in any overt criminal acts to be adjudged criminally liable for the acts." *State v. Miller* (1988), 231 Mont. 497, 511, 757 P.2d 1275, 1284 (quoting *State v. Bradford* (1984), 210 Mont. 130, 142, 683 P.2d 924, 930). Additionally, while mere presence and the failure to disapprove or oppose another's commission of an offense are insufficient to sustain an accountability charge, these factors may be considered by a jury, along with other circumstances, which may indicate whether the accused in some way aided or abetted the principal in the commission of the crime. *Hart*, 191 Mont. at 390, 625 P.2d at 30 (citations omitted).

¶44 Here, the State presented evidence which establishes that Spang was not merely present at the scene of the crimes. The evidence presented by the State shows that the jury could have inferred that Spang did aid and abet Danell prior to and during his commission of threatening Caplette and Walker with physical harm. Notably, the State presented evidence that Spang had unloaded and reloaded the clip to the nine millimeter rifle used by Danell to threaten the victims, Spang assisted Danell in collecting collateral from Walker's garage, Spang pulled the telephone cords out of the walls in Walker's residence, and Spang failed to

21

disapprove or oppose Danell's commission of the crimes. The State further presented evidence that Spang was associated with Danell prior to the commission of the crimes. Therefore, we conclude that the State presented sufficient evidence upon which a rational trier of fact could find beyond a reasonable doubt that Spang committed two offenses of intimidation by accountability. Consequently, we hold that the District Court did not abuse its discretion in denying Spang's motion for directed verdict on the intimidation by accountability charges.

¶45 Furthermore, we note that Spang also contends the District Court erred in denying a hearing on his motion to dismiss based on lack of a speedy trial, and forcing him to choose between a hearing on his motion or a trial. As we have repeatedly emphasized, "[a] District Court will not be put in error where it was not accorded an opportunity to correct itself." *State v. Long* (1986), 223 Mont. 502, 506, 726 P.2d 1364, 1366 (citation omitted). The record clearly reflects that Spang's counsel voluntarily withdrew the motion and failed to object to the options regarding the disposition of the motion presented by the District Court. Thus, Spang's claim of error on this matter was not before the District Court. Hence, we will not address this issue on appeal.

¶46 Affirmed in part, reversed in part and remanded for a new trial on the two counts of intimidation by accountability.

/S/ JIM REGNIER

We Concur:

22

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice Jim Rice concurring in part and dissenting in part.

¶47    I concur in affirming the District Court's denial of the motion for a directed verdict, but dissent from the Court's reversal of Spang's conviction on the grounds that the District Court erroneously denied Spang's motion to suppress his confession of September 19, 1999.

¶48    Spang was arrested on September 17, 1999, after police implicated him in the deaths of Kristi Walker and Kevin Caplette. Later that day, Officer Olson and Deputy VanVleet left Havre and traveled to Great Falls, where Spang was detained, to question him, and arrived shortly after 11:00 p.m.  After Spang waived his rights, the officers interviewed him for over an hour.  By then, it was early in the morning of September 18, and the officers decided to conclude the interview, return to Havre, and continue the interview the next day, September 19.  The officers informed Spang of their intentions and returned to Havre.  The District Court found this interview was not unduly long or grueling, and stated as follows about Spang:

> Even though he is young, defendant has more experience with the legal system, and his rights, than most people. He is "street wise."  It is apparent from the tapes that he was not intimidated by his surroundings, was alert and aware of his situation.  He was aware of his rights, was reminded of them, voluntarily waived his right to counsel and gave a statement on September 17-18, 1999.

¶49    The District Court then found that "as promised," Officer Olson, on September 19, 1999, again made the lengthy trip from Havre to Great Falls, accompanied by Officer Tate, to continue the interview with Spang, at which time the conversation referenced by the Court in ¶ 7 occurred.   After considering the evidence of this interview, the District Court found:

24

Upon review of the transcript and recordings in this matter, it is clear that Officer Olson did not "interrogate" the defendant after he requested an attorney. The defendant mentioned an attorney, and the officer asked some clarifying questions. Those questions were not reasonably likely to elicit an incriminatory response. In fact they did not. Nor did the question "Do you want to talk to us before you talk to a lawyer?" contain a measure of compulsion above and beyond that which is inherent in custody itself. There is no indication that Olson tried to talk defendant out of his decision.

¶50 In fact, Officer Olson was even more accommodating to Spang as their conversation continued. After Spang indicated that he would continue the interview, Olson did not, as the Court's opinion states at ¶ 7, immediately commence interrogation of Spang. The Court omits the portion of the conversation in which Olson, after Spang indicated he would speak with them, once again asked Spang if he would like to have a lawyer before doing so. Spang responded by indicating that he would talk to the officers without a lawyer. These facts led the District Court to conclude:

It is not impermissible to inquire if a defendant wants a lawyer before he speaks. This is especially true in this particular instance as (a) Mr. Spang had already made a statement concerning the crimes and, (b) the way the statement of the defendant was phrased. Here, it was the defendant himself who decided to continue the interview and answer questions. . . . Considering all of the circumstances, defendant waived his right to consult with a lawyer or have a lawyer present before speaking to the police on September 19, 1999.

¶51 I agree. As the District Court found, Spang was "street wise" and well aware of what was necessary to invoke his rights. Yet, from his comment, Officer Olson could not know if Spang wanted a lawyer right then, or if he was expressing a general need for one to be appointed at some point. Thus, Olson asked a clarifying question. The Court would require that the officers, at the Defendant's mention of the word "lawyer," silently turn off the tape recorder, get up, gather their materials, walk out of the room, and drive back to Havre

25

without so much as a question to clarify if that was the Defendant's intention. Such a conclusion is neither a reasonable assessment of the circumstances here, nor a balanced rule for future cases, inviting the problem about which the United States Supreme Court has warned:

> We decline . . . [to] require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. . . . [A] rule requiring the immediate cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity," *Michigan v. Mosely* [citation omitted], because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present.

*Davis v. United States* (1994), 512 U.S. 452, 459-60, 114 S.Ct. 2350, 2355-56, 129 L.Ed.2d 362, 372.

¶52 Finding that Officer Olson's questioning was appropriate under the United States Constitution and the Montana Constitution, and following this Court's holding in the similar case of *State v. Brubaker*, I would uphold the District Court's denial of the motion to suppress and affirm Spang's conviction.

/S/ JIM RICE