No. 03-809

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 107

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

SAMUEL ALEXANDER HONEY,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                     In and for the County of Ravalli, Cause No. DC 2002-30
                     The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Charles E. Umhey III, Attorney at Law, Hamilton, Montana

        For Respondent:

                Honorable Mike McGrath, Montana Attorney General, Pamela P. Collins,
                Assistant Attorney General, Helena, Montana; George H. Corn, Ravalli
                County Attorney, William E. Fulbright, Deputy County Attorney, Hamilton,
                Montana

Submitted on Briefs:  December 8, 2004

Decided:  May 3, 2005

Filed:

_____
                       Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Samuel Alexander Honey (Honey) appeals the Twenty-First Judicial District Court's denial of his motion to suppress his confession of multiple burglaries and thefts. He also challenges the District Court's Order sentencing him to pay restitution to his victims and to forfeit his posted cash bond, which was then applied toward his restitution obligation. We affirm in part and reverse and remand in part.

## ISSUES

¶2 Honey raises the following issues on appeal:

¶3 Did the District Court err in denying his pretrial suppression motion?

¶4 Did the District Court impose an illegal sentence when it ordered Honey to pay restitution without suspending or deferring any portion of his sentence?

¶5 Did the District Court err in ordering forfeiture of the cash bail posted by Honey for payment of restitution?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 In December 2001, the Ravalli County Sheriff's Office (RCSO) received reports that a home construction site in Darby, Montana, had been broken into twice within several days and approximately $8,000 worth of tools and equipment was stolen. The RCSO also received tips that Honey, who was eighteen, and two of his friends and roommates, Justin Hadley and J.R. Olson, committed the burglaries. Detective Burlingham of the RCSO was assigned to the case and tried to reach Honey at Honey's residence on several occasions but Honey never responded to Burlingham's phone or written messages.

¶7     On the morning of February 13, 2002, Burlingham arrested Hadley, who had possession of some of the stolen goods and who confessed that he, Honey, Olson, and a female friend had committed the crimes. Burlingham also interviewed Olson that morning. That afternoon, Burlingham traveled to Honey's place of employment and waited in the parking lot for Honey to get off work, at which time he asked Honey to sit with him in his squad car and discuss some reported thefts. Burlingham immediately told Honey that he was not under arrest. Burlingham also told Honey he was going to audiotape their conversation, and he did so. Honey asked whether the discussion was going to be about his complaint some months earlier that he had been the victim of a theft. Burlingham responded that it would be about that theft and "some others." He then read Honey his *Miranda* rights and asked Honey to sign the *Miranda* waiver form. Honey suggested that perhaps he needed a lawyer. Burlingham then agreed to discuss only Honey's reported theft, after which Honey signed the *Miranda* waiver. While Honey was signing the waiver, Burlingham informed Honey that, earlier in the day, he had arrested Hadley and had interviewed Olson at the RCSO.

¶8     The audiotape reflects that, after spending several minutes discussing Honey's reported theft, Burlingham specifically told Honey that he was not under arrest and that he could leave the detective's car at any time; in fact, the car door by Honey remained open throughout most, if not all, of their discussion. The detective also suggested that it would be in Honey's "best interest at least to listen to what [Burlingham had] to say." Honey agreed to do so. Burlingham told him that after listening if Honey did not want to talk to

3

him, he did not have to. Again, Honey agreed. Burlingham then described the construction site burglaries based upon Hadley's confession in which he revealed that Olson and Honey also participated. At the end of the description of this burglary, Burlingham said, "Now, you need to make a decision. . . . do you wanta' talk to me about these things or do you just wanta' walk away? It's strictly up to you." Honey replied, "Well, I don't know but ----- like I said I should probably have a lawyer present for any other ------." (Dashes in interview transcript.) Burlingham immediately responded, "There you go. That'll work for me." Honey attempted to explain that he wanted to find out from a lawyer what "the best course of action" would be. Burlingham stated, "Okay. This is the only time you're gonna' get a chance to talk to me 'cause I'm not gonna' talk to you again. You've already invoked your rights so Adios." Honey then asked Burlingham, "What's that supposed to mean? You make it sound like the next time you're talkin' to me, I'm gonna' be in handcuffs." Burlingham agreed, "You probably will. You probably will 'cause I know you're involved and I can prove it. You know a guy over in . . . Oregon, Albany, by the name of Mr. Shawn Wolf?" Honey replied, "No I don't." Burlingham told him that he would soon. He then ordered Honey out of his car. Honey persisted in questioning Burlingham despite Burlingham's repeated commands to get out of his car. Honey then indicated that he would talk willingly to Burlingham about the burglary. Burlingham instructed Honey that any further discussion would have to take place at the RCSO. He then gave Honey the option, four different times, that "if" Honey wanted to talk about it, Honey would have to drive

4

himself to RCSO and meet Burlingham there. Honey asked for directions to the Sheriff's Office.

¶9     Burlingham left the premises and Honey, driving his own car, followed him approximately thirty-five miles to the RCSO. Along the way, Honey pulled into a roadside parking lot. Burlingham testified that because he did not know whether Honey would hurt himself, he turned around and pulled next to Honey in the parking lot to check on him. After confirming that Honey was all right, Burlingham proceeded to the RCSO, followed by Honey.

¶10     Upon arrival at the RCSO, Burlingham and Honey went to an interview room with videotape equipment and the equipment was activated. Burlingham pointedly asked Honey if he drove to the RCSO because he wanted to talk to the detective about the aforementioned thefts. Honey replied that he did. Burlingham showed Honey the *Miranda* waiver he had signed earlier, and also confirmed that Honey had invoked his rights at the earlier interview. Honey explained that his mother "always said get a lawyer." Honey then stated that he wanted to talk to Burlingham about the burglaries now, and he signed an unconditional *Miranda* waiver. Burlingham explained to Honey that he was not under arrest at that time, that Burlingham would not arrest him that day regardless of what Honey told him, and that Honey was free to leave at any time. During the one and one-quarter hour interview that followed, Honey confessed to two burglaries at the construction site and one burglary at a Stevensville, Montana, barn. At the conclusion of the interview, Honey left.

5

¶11 On March 4, 2002, the State filed an Information against Honey for one count of felony burglary, one count of felony theft and one count of misdemeanor theft. On March 13, 2002, Honey posted a $10,000 cash bond. On April 3, 2002, the State amended the Information to include another count of felony burglary and another count of felony theft. These additional counts, based on information revealed to Burlingham by Hadley, stemmed from three thefts from the Stevensville barn committed by Honey and Hadley, and perhaps Olson.

¶12 Honey, represented by counsel, entered a plea of not guilty to all counts. On June 3, 2002, Honey filed a Motion to Suppress arguing that his confession was not voluntary and that he was denied his right to an attorney. The District Court held a hearing on the Motion on July 11, 2002. On September 17, 2002, the District Court denied Honey's Motion. After a trial on January 27 and 28, 2003, a jury found Honey guilty of all counts. On May 14, 2003, the District Court sentenced Honey to five years with the Department of Corrections for each felony count, to be served concurrently. It sentenced him to thirty days at the detention center for the misdemeanor charge, with full credit given for time served before sentencing. Additionally, the District Court ordered Honey to pay restitution, jointly and severally with Hadley and Olson, to the victims of their crimes, totaling $14,686. Lastly, the District Court ordered forfeiture of Honey's $10,000 cash bond and directed that these funds be paid to the crime victims for restitution. The court instructed that, to the extent Hadley and Olson paid restitution, some portion of their payments would go to Honey to reimburse him for paying more than one-third of the total restitution amount. Honey appeals

6

the District Court's denial of his motion to suppress, the order of restitution, and the forfeiture of the cash bond.

## STANDARD OF REVIEW

¶13 The standard of review of a district court's denial of a motion to suppress evidence is whether the court's findings are clearly erroneous. To determine whether a finding of fact is clearly erroneous, this Court ascertains whether the finding is supported by substantial evidence, whether the district court misapprehended the effect of the evidence, and whether the Court is nevertheless left with a definite and firm conviction that the district court made a mistake. We further review a district court's denial of a motion to suppress to determine whether the court's interpretation and application of the law are correct. This Court's review is plenary as to whether the district court correctly interpreted and applied the law. *State v. Martinez*, 2003 MT 65, ¶ 19, 314 Mont. 434, ¶ 19, 67 P.3d 207, ¶ 19 (internal citations omitted).

¶14 We review a criminal sentence for legality; in other words, we determine whether the sentence is within statutory parameters. *State v. Webb*, 2005 MT 5, ¶ 8, 325 Mont. 317, ¶ 8, 106 P.3d 521, ¶ 8.

**DISCUSSION**

¶15    Did the District Court err in denying Honey's pretrial Motion to Suppress?

¶16    Honey argues that, under the totality of the circumstances, his confession was involuntary. He maintains that he felt coerced and that he had no choice but to meet with Burlingham both in the parking lot after work and at the RCSO. He claims that he invoked his right to counsel and Burlingham refused to respect his invocation. He contends that the interview at the RCSO was merely a continuation of the parking lot interview, and that the change in location did not relieve Burlingham of the responsibility to respect his wishes for an attorney. The State counters that Honey was not subject to custodial interrogation, and that the interviews were separate and distinct interviews in which Honey voluntarily engaged. It further argues that Honey was provided his *Miranda* rights at both interviews and he voluntarily waived them.

¶17    The District Court issued a detailed, thirty-one page Opinion and Order following Honey's suppression hearing. The court first examined whether either of Honey's interviews with Burlingham constituted a custodial interrogation. It then analyzed whether Honey's confession was voluntary. Lastly, the court evaluated whether Honey's waiver of an attorney was effective.

¶18    We have repeatedly held that the State may not use confessions or admissions obtained through "custodial interrogation" without first providing proper *Miranda* warnings. *State v. Saxton*, 2003 MT 105, ¶ 38, 315 Mont. 315, ¶ 38, 68 P.3d 721, ¶ 38 (citation omitted). The United States Supreme Court has defined "custodial interrogation" as

8

"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707. We look to the totality of the circumstances surrounding the defendant's questioning to determine whether the defendant was deprived of his or her freedom. We consider the time and place of interrogation, the length and mood of interrogation, and persons present during the questioning to determine whether a "reasonable person" would feel free to leave. *Saxton*, ¶ 38 (citations omitted). We also consider whether the suspect was arrested at the end of the questioning session. *State v. Reavley*, 2003 MT 298, ¶ 19, 318 Mont. 150, ¶ 19, 79 P.3d 270, ¶ 19 (citation omitted).

¶19 As indicated above, both interviews between Burlingham and Honey took place in the afternoon. Significantly, both interviews were recorded. The interviews were relatively short and the tone of the parties was respectful. Only Burlingham and Honey were present during both interviews. Honey was told at both interviews that he was free to go at any time and that he was not under arrest. He was informed at the second interview that he would not be arrested that day regardless of what he said. He was also allowed to go to the bathroom during the interview at the RCSO and could have left at that time. Burlingham instructed Honey that if he felt pressured, he should say so. Burlingham did not lie to Honey about Burlingham's knowledge of the circumstances of the crimes nor did he make any promises to Honey based on Honey's cooperation. Honey was not arrested after either interview. Given these circumstances, the District Court concluded that neither interview constituted

9

a custodial interrogation as defined by *Miranda* or under the totality of the circumstances test in *Saxton.*

¶20    The District Court also considered whether Honey's confession was voluntary. For a confession to be admissible, it must be given "freely, voluntarily, and without compulsion." *State v. Allies* (1979), 186 Mont. 99, 109, 606 P.2d 1043, 1049. The District Court stated, "Arguendo, even if Honey's interviews were deemed to have been custodial interrogations, the determination of whether his confession was the product of free choice or compulsion is a factual question which must take into account the totality of the circumstances."

¶21    Whether a confession is voluntary is a factual question which requires looking at "the totality of the circumstances." As we noted in *State v. Grey* (1995), 274 Mont. 206, 210, 907 P.2d 951, 954, "several factors can culminate in a totality of circumstances that render a confession involuntary." We explained that confessions extracted by threat or violence, by implied or express promises, or by the exertion of improper influence had the potential for being involuntary. *Grey*, 274 Mont. at 211, 907 P.2d at 954. In addition to the above factors, when considering the totality of the circumstances, courts have consistently focused on a number of other particularly relevant factors, including: 1) the defendant's age and education level; 2) the length and method of the interrogation; 3) whether the defendant was advised of his or her *Miranda* rights; 4) the defendant's prior experience with the criminal justice system and police interrogation; 5) the defendant's experience and background; 6) and the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties. *State v. Scarborough*, 2000 MT 301, ¶ 32, 302 Mont. 350, ¶ 32, 14 P.3d

10

1202, ¶ 32 (citation omitted). See also *State v. Reavley*, 2003 MT 298, 318 Mont. 150, 79 P.3d 270, which contains an extensive analysis of the voluntariness of a confession.

¶22 The District Court looked at each of the above-listed factors and made the following relevant observations: 1) At the time of the interviews, Honey was eighteen years old. He had attended high school through the tenth grade but had recently received his GED; 2) The first interview lasted approximately twenty minutes and was conducted in Burlingham's car with the car door near Honey open most, if not all, of the time. The second interview was conducted at the RCSO and lasted approximately one hour and fifteen minutes. Both interviews were conducted in the afternoon. The parties were respectful of one another and Honey was immediately allowed to go to the bathroom when he requested to do so; 3) Honey was given his *Miranda* rights at the beginning of both interviews. He voluntarily, but conditionally, waived his rights during the first interview. He voluntarily and unconditionally waived his rights during the second interview; 4) Honey admitted that he had been charged with domestic/family member violence when he was fifteen years old after a fight with his brother. He also had been charged with accessory in a property destruction case. He had served time in jail in the past. He had been interviewed previously by police or detectives, and had served some jail time; 5) At the time of the interviews with Burlingham, Honey lived on his own and had been doing so for some time. He had a job, a car, paid his bills and was not on public assistance; 6) The audiotape of the initial interview, the videotape of the second interview and Honey's demeanor at the suppression

11

hearing revealed that Honey was "unruffled and cool." He was articulate and coherent and "exhibited a reasonable capacity to make full use of his faculties."

¶23 Relying on *State v. Hermes* (1995), 273 Mont. 446, 450, 904 P.2d 587, 589, Honey maintains that his interview with Burlingham in the detective's car constituted a coercive setting. In *Hermes*, we affirmed the district court's determination that Hermes' confession was involuntary for the following reasons: an officer and a social worker interviewed Hermes outside of his isolated primitive home in Lincoln County; the interview was conducted in the cab of the social worker's truck with the officer seated next to Hermes on the front seat and the social worker directly behind him; the truck doors were closed creating a small enclosure; Hermes was not told he could leave at any time; Hermes had a seventh grade education and had never been charged with a crime or interrogated by the police prior to that day; the officer's voice immediately changed upon starting the tape recorder and he "barked" repeated accusatory questions at Hermes; Hermes was not given *Miranda* warnings. Under the totality of these circumstances, we concluded that Hermes' confession was involuntary and the district court correctly suppressed it from use during Hermes' trial. *Hermes*, 273 Mont. at 451, 904 P.2d at 588, 589.

¶24 In *Grey*, also relied upon by Honey, Grey was in custody and underwent a custodial interrogation in the police station booking room. *Grey*, 274 Mont. at 208, 907 P.2d at 952. There was no written record that Grey received and waived his *Miranda* rights. Moreover, the officer made repeated and multiple false statements in order to induce Grey's confession. Once again, based on the totality of the circumstances, including police deception and failure

12

to give Grey an adequate *Miranda* warning, we held that the district court erroneously found that Grey's confession was voluntary. *Grey*, 274 Mont. at 214, 907 P.2d at 955-56.

¶25 Also in *State v. Grimestad* (1979), 183 Mont. 29, 598 P.2d 198, we affirmed the district court's conclusion that Grimestad's written statement following his police station interrogation was involuntary because the officers merely paid "lip service" to Grimestad's *Miranda* warnings; they repeatedly told him and his parents that he was not a suspect and was not being accused of a crime; the officers kept refuting Grimestad's version of the shooting; and there was a suggestion that Grimestad would be institutionalized in a mental institution if he did not remember the details of the crime.

¶26 The District Court carefully analyzed each of these cases and determined, based on the facts of Honey's interviews set forth above, that the cases were distinguishable and did not support Honey's claim of involuntariness. The court specifically found that the interview in Burlingham's vehicle in the middle of the afternoon in a public place was not a coercive setting. Further, the court found Honey's assertions that Burlingham tricked him into signing a waiver, misinformed him about Hadley's confession, and "threatened, badgered, and intimidated" him until he agreed to a second interview were unsupported by the taped evidence of the interviews and the record.

¶27 After a detailed analysis of Honey's confession, the District Court concluded that under the totality of the circumstances, the "facts weighed heavily in favor of voluntariness." Additionally, it concluded there was no evidence that Honey's confession was extracted by

threat or violence, by exertion of any improper influence, or by any direct or implied promises. See *Scarborough*, ¶ 32.

¶28 Upon determining that Honey's confession was voluntary and that he was not subject to custodial interrogations, the District Court nonetheless took the additional precautionary step of analyzing whether Honey's waivers of representation would have been effective, *had Honey been in custodial interrogations*. In other words, presuming Honey's interviews had been custodial in nature, were his signed *Miranda* waivers effective waivers of his right to counsel or was he denied his right to an attorney?

¶29 The court noted that during Honey's initial conversation with Burlingham, he invoked his right to counsel. However, after reaching an agreement with Burlingham to limit the discussion to the burglary Honey reported, Honey signed the provided *Miranda* waiver. Honey asserts that Burlingham immediately told him that he had arrested Hadley that morning and had met with Olson earlier that day. Honey maintains that Burlingham's mention of his co-defendants in the thefts in which Honey was suspected was coercive and intimidating.

¶30 Notably, the audiotape reflects that after hearing the evidence implicating him in the thefts, Honey replied that he "probably" should have a lawyer. At this point, Burlingham abruptly stopped the conversation, telling Honey that this would be his last opportunity to talk to Burlingham about the thefts. Honey testified that he knew he was free to go but was "curious" and did not get out of the car. Rather, he continued to try to talk to Burlingham. Burlingham ultimately ordered him out of the car at which time Honey told him that he

14

would talk about one of the thefts. Burlingham told him that he would only speak to him at the RCSO and Honey agreed. Honey further testified that while driving his own car to the RCSO, he thought about getting a lawyer and that he could have gotten one but chose not to do so. Upon arrival at the Sheriff's Office, Honey explained that his previous decision to invoke his rights stemmed from his mother having always advised him to get a lawyer. Honey continued, however, that he knew he was in trouble and wanted to try to straighten the matter out. He then unconditionally and voluntarily signed a *Miranda* waiver.

¶31 The District Court concluded, based on the recording and Honey's admissions, that when Honey unequivocally invoked his right to counsel during the first interview, Burlingham honored it and stopped questioning Honey. *State v. Spang*, 2002 MT 120, ¶ 21, 310 Mont. 52, ¶ 21, 48 P.3d 727, ¶ 21 (citing *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378) (Once a suspect requests counsel during a custodial interview, he is not subject to further questioning until a lawyer has been made available or until the suspect reinitiates conversation with law enforcement officers.) The court therefore concluded Honey was not denied his right to counsel vis-à-vis the first interview. The District Court next considered the second interview. It concluded that Honey reinitiated conversation with Burlingham by following Burlingham to the Sheriff's Office where he voluntarily and unconditionally waived his right to counsel before confessing to the crimes. Based on this reinitiation, Burlingham did not violate Honey's previously invoked right to counsel. We therefore conclude that the evidence supports the District Court's finding that Honey was not denied counsel.

15

¶32    Having found that Honey was not subject to custodial interrogation, that his confession was voluntary, and that he was not unlawfully denied counsel, the District Court denied Honey's Motion to Suppress. We conclude based on the foregoing that the District Court's findings of fact were not clearly erroneous and that the court correctly interpreted and applied the law.

¶33    Did the District Court impose an illegal sentence when it ordered Honey to pay restitution without suspending or deferring any portion of his sentence?

¶34    Honey argues that the District Court exceeded its statutory authority by unlawfully imposing on him an obligation to pay restitution to his victims. He maintains that § 46-18-201(5), MCA (2001), allows the imposition of a restitution obligation only when the sentencing judge defers imposition of sentence or suspends all or part of a sentence. Honey claims that because the sentencing judge did not defer imposition of his sentence or suspend any or all of it, the imposition of a restitution obligation is improper and exceeds statutory authority.

¶35    The State maintains that Honey waived any claim of error as to his sentence because he made no objection to it at the time of sentencing. As we have stated on numerous occasions, a defendant must raise an objection in a timely manner or the objection is waived and this Court will not hear it on appeal. *See, e.g., State v. Baker*, 2000 MT 307, ¶ 30, 302 Mont. 408, ¶ 30, 15 P.3d 379, ¶ 30; *State v. Harris*, 1999 MT 115, ¶ 11, 294 Mont. 397, ¶ 11, 983 P.2d 881, ¶ 11. Notwithstanding this rule, this Court has established a narrow but important exception. In *State v. Lenihan* (1979), 184 Mont. 338, 602 P.2d 997, we held that

16

"the better rule [is] to allow an appellate court to review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. Thus, even if a defendant fails to contemporaneously object at sentencing, we will accept jurisdiction of an appeal that has been timely filed which alleges that a sentence is illegal or exceeds statutory authority. *Accord State v. Brister*, 2002 MT 13, ¶¶ 15-16, 308 Mont. 154, ¶¶ 15-16, 41 P.3d 314, ¶¶ 15-16. Therefore, we will address Honey's claim that his sentence was illegal or exceeded statutory parameters.

¶36     The State argues that under *State v. Heath*, 2004 MT 126, 321 Mont. 280, 90 P.3d 426, restitution is authorized in this case. The State relies on the following sentence: "Under Montana's sentencing statutes, restitution is a sentencing option whenever the sentencing court considers it necessary for rehabilitation or for the protection of the victim or society, and there is an appropriate correlation to the offense committed." *State v. McDanold*, 2004 MT 167, ¶ 15, 322 Mont. 31, ¶ 15, 97 P.3d 1076, ¶ 15 (citing *Heath*, ¶ 38). The State also directs our attention in passing to § 46-18-202(1)(f), MCA (2001), as additional statutory authority for the imposition of a restitution order, but fails to present any legal argument or authority for its application to the case at bar. As a result, we will not address the applicability, or lack thereof, of § 46-18-202, MCA, to the case before us. Rule 23(b), M.R.App.P; *Sellner v. State*, 2004 MT 205, ¶ 51, 322 Mont. 310, ¶ 51, 95 P.3d 708, ¶ 51 (Sellner "cursorily" raised four issues pertaining to his counsel's deficient performance. For

three of these issues, he failed to cite to any authority and made only conclusory statements. Under Rule 23, M.R.App.P., we refused to consider his unsupported arguments.)

¶37 It is well-established that "when deciding a case involving the commission of a crime or sentencing for a crime, we use the criminal statutes in effect at the time of the commission." *Dexter v. Shields*, 2004 MT 159, ¶ 13, 322 Mont. 6, ¶ 13, 92 P.3d 1208, ¶ 13 (citation omitted). Therefore, unless otherwise noted, we will analyze, as did the District Court, the 2001 version of the relevant Montana sentencing statutes.

¶38 Section 46-18-201, MCA, sets forth the sentences that may be imposed upon an offender found guilty of an offense by way of a guilty verdict, a guilty plea or *nolo contendere*. Section 46-18-201(1)(a) and (b) address deferred sentences, § 46-18-201(2) addresses suspended sentences, and § 46-18-201(3)(a)-(h) addresses sentences that have neither a deferred nor a suspended component. Section 46-18-201(4) authorizes a sentencing judge, when deferring imposition of a sentence or suspending all or a portion of the execution of a sentence, to impose "any reasonable restrictions or conditions during the period of the deferred imposition or suspension of sentence." Sections 46-18-201(4)(a)-(o) provide examples of such "reasonable restrictions or conditions." Section 46-18-201(4)(n) offers a "catch-all" provision which allows "any other reasonable restrictions or conditions considered necessary for rehabilitation or for the protection of the victim or society."

¶39 Section 46-18-201(5), the "mandatory sentencing" provision, states:

18

In addition to any penalties imposed pursuant to subsection (1),[1] if the sentencing judge finds that the victim of the offense has sustained a pecuniary loss, the sentencing judge shall require payment of full restitution to the victim as provided in 46-18-241 through 46-18-249.

¶40 Section 46-18-241, referenced in § 46-18-201(5) allows:

As provided in 46-18-201, a sentencing court shall require an offender to make full restitution to any victim of the offense who has sustained pecuniary loss as a result of the offense, including a person suffering an economic loss as a result of the crime. The duty to pay full restitution under the sentence remains with the offender until full restitution is paid.

¶41 Honey claims that § 46-18-201(5) allows the imposition of a restitution obligation only when the sentencing judge defers imposition of sentence or suspends all or part of the sentence, and that imposing a restitution obligation on him without deferral or suspension is unlawful. Despite the State's reliance on *Heath* for a contrary outcome, under the express language of the statute, and as it has been subsequently interpreted by *Heath*, we conclude Honey is correct.

¶42 In *Heath*, Heath pled guilty to both felony and misdemeanor offenses and was sentenced to ten years in the Montana State Prison with two years suspended upon conditions, one of which was the payment of restitution. He appealed the restitution obligation on various grounds. One such ground was that the 1999 statutory amendments to § 46-18-201 eliminated a sentencing court's authority to impose restitution as a condition

---

[1] As noted in Paragraph 38, subsection (1) of § 46-18-201 addresses deferred sentences. As we held in *Heath*, subsection (5) applies equally to deferred and suspended sentences. We concluded that the legislative modifications codified in 1999 failed to accurately reflect the renumbered subsections and subsection (5) should have referred to new subsection (4) rather than subsection (1). This will be discussed more fully below.

of a *suspended* sentence. In other words, as a result of the legislative changes to § 46-18-201, MCA (1999), a sentencing judge could require restitution under § 46-18-201(5), MCA, only from an offender with a *deferred* sentence.

¶43    On appeal, we recognized that the legislature in its 1999 amendments rearranged many of the provisions of § 46-18-201, MCA. As a result of rearranging the statute's provisions, the subsections were renumbered. Whereas deferred and suspended sentences had previously been combined under § 46-18-201(1), under the amendments, deferred sentences were addressed in subsection (1) and suspended sentences were addressed in subsection (2). Additionally, the many "reasonable restrictions or conditions" formerly included in subsection (1) became new subsection (4), and the mandatory restitution provision, formerly subsection (2) became new subsection (5). In an effort to determine whether the legislators intended to substantively change the law as to restitution for suspended sentences, we compared the 1997 provision with the 1999 provision; we analyzed substantially similar predecessor sentencing provisions; we reviewed relevant cases; and we studied the legislative intent behind the modifications. We ultimately concluded that "it was the Legislature's full intention that subsection (5) cross-refer, not to subsection (1), but to subsection (4), which contains all of the penalties and conditions which may be imposed for both deferred impositions of sentences and for suspensions of sentences." *Heath,* ¶ 36. As a result, we held that § 46-18-201 continued to allow the imposition of restitution on *both deferred and suspended sentences*.

¶44 However, we did not, as the State now argues, conclude in *Heath* that, under the statute as amended, restitution could be imposed in all cases, including those in which the defendant is sentenced to an unsuspended term of imprisonment. Indeed, in virtually every case in which restitution under this statute, or its substantively identical predecessor, § 46-18-201(2), MCA, is addressed, the presumption that the statute applies *only* to cases of suspended or deferred sentences is apparent, as in each case, it is to these sentences--and not imprisonment sentences--that the restitution obligation has been attached. *See, e.g., State v. Benoit*, 2002 MT 166, 310 Mont. 449, 51 P.3d 495; *State v. Flanagan*, 2003 MT 123, 316 Mont. 1, 68 P.3d 796. Therefore, we conclude that the District Court unduly and erroneously broadened our decision in *Heath* when it concluded that restitution could be imposed on top of Honey's prison term.

¶45 Based on the foregoing, we conclude that the District Court's imposition of restitution under § 46-18-201, MCA (2001), in the absence of a deferral or suspension of all or part of Honey's sentence, was improper and outside of the statutory parameters.

¶46 Because we reverse the District Court's Order imposing a restitution obligation on Honey, we also reverse the court's Order requiring Honey to forfeit the cash bail he posted and to have the forfeited bail applied to his restitution obligation.

**CONCLUSION**

¶47 For the foregoing reasons, we affirm the District Court's denial of Honey's Motion to Suppress. We reverse the District Court's Order of restitution and cash bail forfeiture, and remand for resentencing in accordance with this Opinion.

21

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER

Justice W. William Leaphart concurring in part and dissenting in part.

¶48    I concur in the Court's Opinion with the exception of the holding on the question of requiring forfeiture of the cash bail to pay for restitution. The Court declines to address the State's reliance on § 46-18-202(1)(f), MCA, because the State "fails to present any legal argument or authority for its application to the case at bar."  I would not engage in such a draconian application of the Rule 23(a)(4), M.R.App.P., requirement that a brief contain contentions and reasons therefor.  Notably, Rule 23(a)(4), M.R.App.P., states: "The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, **statutes** and pages of the record relied on." (Emphasis added.)  The statute cited by the State, § 46-18-202(1)(f), MCA, is clear on its face and is a sufficient authority in and of itself.  It allows a sentencing judge to impose any of the enumerated restrictions, including "(f) any other limitation reasonably related to the objectives of rehabilitation and the protection of the victim and society," for example, restitution.  It needs no further citation to authority.  Irrespective of whether the Court agrees with the State's argument, it is wrong to invoke Rule 23 and ignore the argument. Furthermore, I agree with the State's argument that the statute allows the sentencing court discretion to impose restitution when it would advance the objectives of rehabilitation and protection of the victim.  I would affirm the imposition of restitution.

/S/ W. WILLIAM LEAPHART

23